## Marston & a. *v.* Durgin.

In a voluntary association, where the plaintiffs were proved to own fourteen shares out of one hundred, and claimed to own many more, and the evidence tended to show that the defendant owned seventy-seven shares, and there was no evidence that anybody else owned any of the shares except these parties, the court will grant an injunction in behalf of the plaintiffs against the defendant to prevent his removing the building of the association from their land, or converting it to a purpose different from the original purpose and object of the association, without the consent in writing of the plaintiffs, or until the court shall permit him thus to remove or use said building, in some proceeding to which said association shall be a party.

Where the plaintiffs' right is settled or proved, there is no need of a

suit at law before an injunction is granted, even though the amount of the plaintiffs' interest is not settled.

In such case it would be immaterial who was in possession, for possession generally gives an advantage to the party enjoying it only while the right is in dispute.

One shareholder in an association is not bound to object to any repairs being made to the company buildings by any other shareholder who chooses to make them, so long as such repairs were necessary and proper for the use of such buildings, in the manner in which the association had used and might properly use them.

It is only when some right of the association or of its members is invaded or threatened, or some act is done, attempted, or threatened, which is or would be hostile to the rights of the association or some of its members as such, that they are called upon to speak or act in defence of those rights.

IN EQUITY.   This was a bill in chancery, in which William S. Marston, Clark Durgin, and William A. Bachelder, all of Andover, in said county, complain against Charles A. Durgin, of the same Andover, and say that about or during the year 1850, the plaintiffs, with divers other persons, many of whom are not now remembered by them, formed themselves into an association, under the laws of this state, under the name of " The East Andover High School Association," and under that name, and as such association, were, as the plaintiffs believe, duly organized; that one Joseph Osgood, of the same Andover, deeded to said association, or to certain persons unknown to the plaintiffs, for the use and benefit of said association, a tract of land in said town, adjoining the North Church lot, so called, in said town, now occupied by the Congregational society, and bounded on the west by said church lot, and on the other three sides by land then owned by the said Osgood but now owned by the said defendant; that in accordance with the purpose for which it was formed, the said association erected upon the said lot of land, in the year aforesaid, a building to be used as a schoolhouse and hall for the general accommodation of the village of East Andover, in said Andover; that for the purpose of raising and obtaining funds to erect said building, one hundred shares of stock of the amount of five dollars each were created and voted by said association, and taken by the members thereof, they paying the sum aforesaid for each share, and that proper certificates were duly issued to the owners of such shares; that the plaintiffs, as members of said association, and in the manner above stated, became the owners of nineteen shares of stock therein, the said Bachelder of seven, the said Durgin of five, and the said Marston of seven,—and the said Durgin has the equitable interest in ten additional shares; that the said land and building, from the time of said deed and the erection of said building, have been used by the said association for its proper purposes, without the inter-

ference of any one, except the said defendant, as hereinafter stated; that the said defendant, who was never a member of said association, claims to hold by purchase a portion of the aforesaid shares, and claims to have obtained a title to the land on which said building stands, by virtue of a quitclaim deed from the said Osgood, and has notified the plaintiffs, in writing, that he claims to have taken possession of the same, and that he intends to appropriate them to his own use, and threatens, and the plaintiffs believe he will carry out his threats if not prevented, to remove the said building from its present location to his own land, and to convert it to his own use, and to other purposes than those for which it was erected and has heretofore been used, without offering any compensation to the complainants for their interest therein, and denying that they have any interest in said land or building, or right thereto; that the plaintiffs charge and believe that the defendant has no valid title to the land on which the building aforesaid is located, and has no other interest in any portion of said property than that which the purchase of a portion of the aforesaid shares, the number of which is unknown to the plaintiffs, gives him; that the plaintiffs believe that said property has been strictly used and occupied for the purposes intended by said association, and that the same now justly and legally belongs to the said association; that the plaintiffs are unable to state more definitely the owners of the remainder of said shares than above stated, or the exact terms of the aforesaid deed to said association, for the reason that the only record of the said shares and of the said deed is in the record book of the said association, which the said defendant has without right obtained and without right holds; that, though requested, the said defendant refuses to allow the plaintiffs or their solicitors to see or examine said book of records, or to set forth and discover the particulars thereof, and intends, as they are informed and believe, to remove said building, as above stated, and thus render it valueless for the purposes for which it was erected, and for which it had been used, and thus unjustly deprive the plaintiffs of their interest in all the property of said association. And thereupon the plaintiffs pray that the said defendant may, upon oath, be required to make full, direct, and perfect answer to all and singular the matters hereinbefore stated and charged, as fully and particularly as if the same were hereinafter repeated, and be thereunto particularly interrogated: and especially that he may answer and set forth what title he has to the said land, if any, and when and from whom the same was obtained; what interest he has in the said building, and when and from whom it was acquired; the number of shares of stock in said association he owns, and when, for what sum, and from whom purchased; the names of the owners of the rest of said shares; whether he has in his possession the deed of the said Osgood to said association, and if so, what, if any, are the conditions, reservations, or limitations of the same; and that said defendant may also be required to furnish to the plaintiffs, or their solicitors, a transcript of the said book of records, or to leave the said book in the hands of the clerk of this honorable court, for the

inspection of the plaintiffs or their solicitors, with liberty for them, or either of them, to take copies thereof or extracts therefrom; and that the said defendant, his agents and servants, may be perpetually enjoined against removing the said building, or tearing down, remodelling, or altering the same, or in any other way interfering with, using, or occupying the property of said association, or any part thereof, and for such other relief as may be just.

In the answer said defendant denies each and every allegation of the plaintiffs, as set forth in their bill, and says that, as he is informed and believes, on March 23, 1850, and before any attempt had been made to form or organize any such association as is described in the plaintiffs' bill, as a corporation under the laws of this state, about fifty people residing in various parts of Andover, in said county, subscribed a paper in the following words, viz.,—"We, the subscribers, will pay the several sums set against our names, respectfully, for the erection of a building at East Andover, of suitable size, finished for an academy and other purposes, to be divided into shares of five dollars each, each shareholder to be entitled to vote, according to number of shares, in all matters in relation to the building and locating said house, and all other matters touching the interest of the same—no subscription to be paid unless a sufficient amount be subscribed (East Andover, March 23, 1850);" that said William A. Bachelder subscribed thereto for five of such shares and no more; that said Clark Durgin subscribed for four of such shares and no more; that said William S. Marston subscribed for five of such shares and no more; and that the firm, composed of one Joseph Osgood and said William S. Marston, subscribed for two of such shares and no more, to be paid for in lumber delivered at East Andover depot; that the whole sum so subscribed amounted to five hundred and ten dollars, which was divided into one hundred and two shares of five dollars each, payable some part in money, some in labor, and some in material; that, also, as he is informed and believes, some of the persons who signed the paper aforesaid, together with others who did not subscribe thereto, and had no interest therein, did afterwards, to wit, in the months of May and June, 1850, attempt to form "themselves" into an association, under the laws of this state, under the name of the "East Andover High School Association," as charged in the plaintiffs' bill, but, as he is informed, instructed, and believes, did not form themselves into such association in conformity to the laws of this state, and have never been duly and legally organized as such association; that, immediately after such attempted formation and organization, said pretended association assumed entire control over said subscription list, and, reckoning the whole amount thereof which was deemed collectable at five hundred dollars, divided the same into one hundred shares, and no more, at five dollars each, and issued stock certificates thereof to each person aforesaid paying therefor; that, as he is informed and believes, out of such one hundred shares such certificates were issued to each of said plaintiffs for the number of shares subscribed for by each as aforesaid, and no more;

that he has no knowledge or belief that any other certificates were ever issued to said plaintiffs or either of them, or that they or either of them had or have any legal or equitable interest in any of such certificates save as aforesaid, nor has he any information thereof, except the statement in the plaintiffs' bill; that on May 20, 1850, said Joseph Osgood conveyed by warranty deed in common form to said pretended association, " their successors and assigns," the tract of land described in the plaintiffs' bill " for an academy building location, and to be held by them for that or any other purpose, except a private dwelling-house; " that said pretended association, with the funds raised as aforesaid in the year aforesaid, erected thereon the building described in the plaintiffs' bill; that he is informed, instructed, and believes that said plaintiffs were never lawful members of such association; that, as he is informed and believes, said building was occupied in one way and another for educational purposes, a part of the time after its erection, up to about the year 1855, and that from that time up to the filing of this bill it has never been occupied by said pretended association for the purposes for which it was erected, though it has been used occasionally to hold political caucuses in and for other purposes, all of which he is instructed and believes are foreign to the purposes of its erection; that he is informed and believes that the meetings of said pretended corporation, from 1853 to April, 1856, were in reality nominal meetings, to keep up the pretence of an organization; that no meeting of the pretended officers of such pretended corporation has been held since April 12, 1856, and that such pretended association has held no meeting, and exercised none of the powers or functions of a corporation since April, 1856; that, up to the time of the purchase by the defendant, as hereinafter stated, said Clark Durgin exercised full control over said premises, and received pay for the improper use thereof, for which he has never accounted to said shareholders, said pretended association, or to any other person lawfully entitled to receive the same; that said Joseph Osgood, for a valuable consideration, conveyed to said defendant the tract of land on which said building stands, described in the plaintiffs' bill, by his quitclaim deed in common form, executed November 4, 1867, and recorded in the registry of deeds for said county, November 5, 1867; that said defendant purchased seventy-seven shares of said one hundred shares, paying therefor, in all, about two hundred dollars, to the proper owners and holders thereof, as follows, viz. :

| | | |
|---|---|---|
| January 8, 1867, of | Thomas Haley, | six shares. |
| 21, | Simon Graves, | one share. |
| | Watson Dickerson, | four shares. |
| | Alice Cross, ex't'x Caleb Cross, | ten shares. |
| 22, | Sarah F. Emery, | one share. |
| | Sam. Morrill, | two shares. |
| | William Graves, | one share. |
| | Mehitable Graves, | one share. |
| | Hannah R. Fellows, | three shares. |

| February 8,   | Jonathan Cilley,     | two shares.    |
|               | Cutting S. Greeley,  | two shares.    |
|               | H. D. Cilley,        | three shares.  |
|               | James Marston,       | two shares.    |
|               | E. G. Kilburn,       | one share.     |
| March 1,      | George E. Emery,     | one share.     |
| May   6,      | Cyrus Bailey,        | two shares.    |
|               | Willard Emery,       | four shares.   |
|        9,     | Jonathan Emery,      | two shares.    |
|       11,     | Sam. Cilley,         | two shares.    |
|       24,     | Joseph Osgood,       | nine shares.   |
| June 18,      | Alfred Weare,        | three shares.  |
|       19,     | James Bailey,        | one share.     |
| July   8,     | J. D. Philbrick,     | four shares.   |
|       10,     | Enoch Sceva,         | one share.     |
|       12,     | John Wadleigh,       | one share.     |
|       25,     | Reuben Dearborn,     | one share.     |
| August 20,    | Thomas P. Clough,    | one share.     |
|               | Peter French,        | one share.     |
| September 2,  | Henry A. Weymouth,   | five shares.   |

That at the time of the purchase of said stock as aforesaid, the proper owners and holders thereof transferred and conveyed to him said stock, and all their rights respectively to all arrears for the use and rent of said building and premises, and in all respects, as far as they were able, put said defendant in their stead; that for a long time prior to said purchase, said building, through neglect and want of care, had been tending to decay, and was before and at the time of said purchase in a dilapidated condition, leaky, rotten, and unfit for use; that, without assistance from the plaintiffs or any other share owner, he put the same in good repair at the expense to him of about one hundred and fifty dollars; that he is informed, instructed, and believes that he has all the rights in said premises which said original owners and shareholders had, and that said plaintiffs, after neglecting and refusing to put said premises in suitable repair, cannot appropriate to their own benefit the money which he has been compelled to expend upon said building to prevent its destruction; that, from the time of such purchase up to the time of the issuing of the temporary injunction in this cause, he has remained in the open, notorious, and undisturbed possession of said premises, and that said defendant, on December 30, 1867, caused to be served on Clark Durgin, one of said plaintiffs, the notice in writing referred to in said bill, in which he claimed that in consequence of certain facts, as he was instructed and believed, said pretended corporation never had a legal existence, and that all the acts and doings of said alleged corporation in the premises were nullities in law, and void, and that he had the lawful right to said building, and that he should hold the same until lawfully dispossessed thereof; and on May 20, 1868, said defendant caused a like notice to be served on each of the other two

plaintiffs; that he has desired to remove said building from its present location to his own land, if he might lawfully do so, but not otherwise, but has never made any threats that he would remove said building and convert the same to his own use, as charged.

The defendant says that after the purchase as aforesaid, the records, etc., of said alleged corporation came rightfully and lawfully into his possession; that, though absent professionally some of the time, he resides in the same town with the plaintiffs, and within a very short distance of two of them; that, during the three years or more that said records have been in his possession, said plaintiffs have had abundant opportunities to apply to him for an inspection of said records, but that during all that time, aside from the injunction itself, up to August 13, 1870, no intimation whatever has ever been made to him or in his presence, by said plaintiffs or either of them, that they had any desire for such inspection; that he has at all times been willing for said plaintiffs, or either of them, to make a proper inspection of said records, and make any transcripts thereof, which they deemed proper; that no application has ever been made to him for that purpose by the plaintiffs' solicitors or either of them; that, upon the statement of the solicitors of the plaintiffs on said thirteenth day of August, 1870, that they desired to examine said book of records and make transcripts thereof, he promptly placed the same in the hands of his solicitor, who, as he is informed and believes, in pursuance of his instructions, forthwith placed said records in the hands of the plaintiffs' solicitors, thus enabling them to make full transcripts thereof of said deed from said Osgood to said pretended association, and of the lists of the original shareholders and owners of stock therein; that, aside from the information so furnished them by said records, he is unable to give any further information as to the ownership of the remainder of said one hundred shares, and that he is unable to reconcile the fact that only one hundred shares of stock were created, as charged in the plaintiffs' bill, the ownership of seventy-seven of which is in him, with the claim of the plaintiffs that the ownership of twenty-nine of said shares is in them, unless it is true, as he has been informed, that spurious certificates of stock have been issued in the name of said pretended association.

The case was heard upon the bill, answer, and proofs.

*Pike & Blodgett*, for the plaintiffs.

Upon the facts disclosed, we submit that a proper case is made for a discovery and relief, and that the injunction was properly granted and should be made perpetual.

I. The plaintiffs clearly have an interest in the association property.

II. They show a case of strong and clear injustice, of pressing necessity, of ruinous and irremediable character, and not of that nature for which an action at law would furnish an adequate remedy. The facts proved and admitted present a case of a peculiar and extraordi-

nary character, both in the subject-matter and in the nature of the injury threatened. In a word, it is a case of irreparable injury. Kerr on Injunct. 200, 225; 2 Story's Eq. Jur., secs. 925–928; Hilliard on Injunct. 21; *Webber* v. *Gage*, 39 N. H. 186, 187, and cases cited. Such injury is alleged in the bill; but if not, it is enough if the court can discover this from the allegation of facts. Hilliard on Injunct., sec. 32, p. 20.

III. The plaintiffs have not been guilty of any improper delay in applying for relief. It is doubtful if they could have had any relief in equity so long as the defendant simply retained the occupation of the building and the possession of the records; but it clearly appears that, as soon as they learned that he was about to destroy and render value-less the property of the association by converting the building into a dwelling-house, they made immediate application for relief. It is the defendant's conduct alone which has brought about the state of things of which the plaintiffs' complain. We deny that there has been any acquiescence in his acts on their part, but if there has, it has been inadvertent, and furnishes no ground for dissolving the injunction. Hilliard on Injunct., sec. 44, p. 26. Even if they did acquiesce in his occupation of the building, which we deny, it does not follow that they are to be estopped from remedy when the defendant is about to destroy the building. Kerr on Injunct. 205.

The fact that the defendant made repairs on the building has no bearing in this suit, and does not affect the plaintiffs' rights. He made them at his own risk. The plaintiffs were not asked to contribute; they were not bound to object. The repairs were not injurious, and there can be no acquiescence where there is no injury to acquiesce in. Kerr. on Injunct. 203.

IV. The plaintiffs are proper parties to maintain the bill. 1. It is doubtful if a voluntary association can maintain a bill in the style and character of a corporate body. Story's Eq. Pl., 4th ed., sec. 497. 2. However this may be, there has been no meeting of the association since April, 1856. Some of the officers are dead; others have left the state; there are no officers authorized to bring or sign a bill in behalf of the association. 3. The plaintiffs and the defendant, so far as known, comprise the association, and may fairly be presumed to represent the rights and interests of the whole, if there be other members, and hence are the proper parties. Story's Eq. Pl., sec. 97 (2), secs. 107–116, and cases cited. 4. The parties are tenants in common under an associate name; and if the association were now legally organized, still any stockholder, as tenant in common, might maintain a bill *alone* in respect of the wrong done himself. Kerr on Injunct. 208, and cases cited. 5. The present controversy is one wholly between individuals. The plaintiffs seek to preserve the association property for the purposes for which it was intended; while, on the other hand, the defendant seeks to convert it wholly to his own use, and to deprive the plaintiffs of their interest in it without compensation.

V. In his answer, and in the notice served on the plaintiffs by the

defendant, he denies that the association has or ever had any legal existence. To this we do not assent; but if it were so, how can the defendant stand any better than the plaintiffs? If their shares are worthless, why are not his also? His deed conveys nothing, because (1) there is no pretence that the land has ever been used "for a private dwelling-house;" and (2) because he took it with full knowledge of the previous conveyance to the association; and (3) because the deed was only intended to convey and does convey simply the right of reversion in the land, if the premises were used for a private dwelling-house. See Osgood's deposition before cited.

VI. It appears that there has been more than one issue of stock. Should it be deemed material to determine the number of shares of each issue owned by the parties, it is agreed by counsel that a master or auditor may be appointed for that purpose.

*Shirley*, for the defendant.

The real parties are Clark Durgin and this defendant, though the "promoters," Bachelder and Marston, are not averse to receiving a benefit from the plaintiff Durgin's zeal. The real matter in issue is the feud of a lifetime, intensified by the result of a suit for trespass brought by the defendant against the plaintiff Durgin in 1867 (January 12)—see Dep. of Clark Durgin, Ints. 128, 129.

By an arrangement between counsel, and because we regard certain questions of law which appear upon its face as decisive of this cause, we submit the case upon the bill, answer, and the proofs taken by the plaintiffs, and have refrained from encumbering it with a mass of testimony which would have presented some parts of it in a very different light from that which the plaintiffs would reflect upon it.

I. There is no equity in the bill.

The plaintiffs fail to make any case for the interference of a court of equity upon the face of their bill, and still more upon their own testimony. The bill distinctly puts the title of the building in question and the land on which it rests in a living corporation. 1. If the defendant has injured that property, or wrongfully withheld it, or threatens to do either, it is self-evident that the injury committed or meditated is one for which he is primarily answerable to the corporation, and not to these plaintiffs. 2. This suit is not brought in the name of a corporation, but by the plaintiffs, for their own benefit, in their own names, and not for the benefit of or in behalf of the other shareholders. 3. There is neither allegation, proof, nor pretence that they are creditors, or that any attempt has been made to settle any question or title at law. 4. The plaintiffs are wealthy; but there is no insinuation, much less an averment, that the pecuniary responsibility of the defendant is not ample—as perfect as their own. Their own testimony shows why they did not venture such a suggestion. Dep. of William S. Marston, Ans. 73; Dep. of Joseph Osgood, Ans. 8; Dep. of William A. Bachelder, Ans. 59. 5. There is neither averment nor suggestion in the bill of

"irreparable injury," nor evidence to support either. 6. They complain only of what, as they say, "they are informed and believe" the defendant "intends" and "threatens" to do to the building of the corporation.

Their whole case, put in its strongest light, is, that a building, "1½ stories high," "42 feet long, 28 feet wide, and 14 feet high, from bottom of sill to top of plate;" "the height of the lower room to be finished 10 feet clear, and containing below but a single room with a 7 feet entry, was erected by a living corporation in 1850, partly on a notch of what is now the defendant's "home-farm," and partly upon the "church-lot" or public common adjoining the defendant's land. Record Book of the Association, Specification; Dep. of Osgood, Ans. 8; Dep. of Clark Durgin, Ans. 28, 51, 52, 66, 107. The erection and continuance upon the "notch" was under the color of Osgood's deed of May 20, 1850. But it is apparent from the testimony of Clark Durgin that he knew when he erected the building that he was locating it partly upon the land of another, and there is nothing in any of the testimony from which an inference can be drawn that he had any license or authority for putting it there; and, in point of fact, he stated at the caption (though, like many other things said by him, it seems not to have been taken down) that he had none.

It is quite clear that since (ch. 2622, P. L., 1862) neither the corporation nor any one else can hold any part of the "church-lot" or public common by adverse occupation, and we suggest that they are all not only trespassers for continuing this encroachment since that act, but are liable to be proceeded against criminally for continuing the nuisance.

The testimony of the plaintiffs shows that no repairs of any account have been made for twenty years, aside from those made by the defendant after the house got "rotten," "leaky," and in such a forlorn condition that plaintiff Marston told plaintiff Durgin, when talking about the necessity for "repairs," that "it was a shame to have the building look so." Dep. of Clark Durgin, Ans. 96, 105, 111, 112, 113.

Beyond this the claim of the plaintiffs is not that the defendant did anything, but that "once," when Parsons was in his employ, he gave Parsons to understand that he proposed to move the building just across the road and to "finish" it into a house. Dep. of William B. Parsons, Ans. 7, 8, 18, 23.

The bill implies, the answer (under oath) most distinctly asserts, and the testimony of the plaintiffs themselves conclusively shows, that since sometime in 1867, prior to December 30, the defendant has, with the full knowledge of the plaintiffs, been in the open, notorious, and undisturbed possession of the premises. Dep. of Clark Durgin, Ans. 7, 8, 9, 10, 111, 113, 134; Dep. of William S. Marston, Ans. 60, 61. The answer distinctly asserts that after the purchase of the stock by the defendant (1867), he (1868) put the building in question in good re-repair at the expense of about $150. The testimony of the plaintiffs

shows that he did make such repairs, and does not venture any sugges-
tion that the defendant did not expend that sum in necessary repairs.
The answer in effect charges that these repairs were made and this sum
expended with the knowledge of the plaintiffs.

In fact, they knew quite as much about it, and probably more than
the defendant did, for he was absent most of the time.  The testimony
sufficiently shows this.

It seems to us that counsel, by stretching the precedents, in effect
ask this court to enact,—" Sec. 1.  That replevin, the landlord and ten-
ant process, all kinds of trespass, case, and Fisk's writ of entry and
possession *vi et armis*, are merged in the 'reconstructed' writ of in-
junction.  Sec. 2. Injunction shall be the only civil remedy in this
state."  In *Lane* v. *Morrill*, 51 N. H. 422, we strenuously resisted an at-
tempt, somewhat akin to this in principle, to secure a decree of this court,
that the process of injunction—like Aaron's rod—should " swallow "
up all common-law remedies, courts, and jurisdictions.  We trust the
court will mark the line in this case, so that there shall be no mistake
in the hereafter.

The bill speaks with a forked tongue, but the case stated in the
strongest light for the plaintiffs is, that a stranger " intends " to com-
mit a trespass to an " occasionally " occupied building of a living cor-
poration.  Its other face is, a prayer to " perpetually enjoin " the de-
fendant from " using " the same,—in other words, to turn him out of
the possession of what he claims to be his own property.

What is the law ?  " The jurisdiction of a court of equity to grant
injunctions against trespass is comparatively of modern establish-
ment."  Kerr on Injunct. 287.  " The jurisdiction of a court of equity
in cases of trespass is in aid of the legal right.  The court inter-
feres on the assumption that the party who makes the applica-
tion has the right which he asserts, but needs the interference
of the court for the protection of the property pending the trial
of the right."  Kerr on Injunct. 294.  " The plaintiffs would
not have been entitled, as of right, to an injunction, if they had
established their title, and recovered damages at law."  *Wason* v.
*Sanborn*, 45 N. H. 169, 171, 173 ; *Bassett* v. *Salisbury Manf. Co.*, 47
N. H. 441, 442, and cases cited.  " Upon looking at the facts alleged,
they present nothing of a peculiar or extraordinary character, either
in the subject-matter, or nature of the injury threatened.   *   *   *
They are the usual consequences of direct trespasses to land, or of torts,
for which consequential damages may be recovered, and for which ade-
quate compensation may be given at law.  They are not of that ruin-
ous and irremediable character, to constitute a case of pressing neces-
sity for arresting them.  The case is not thus urgent."  *Coe* v. *Win-
nipiseogee Manf. Co.*, 37 N. H. 264.  " To justify the interference of
a court of equity for the issue of their final writ of injunction, the plain-
tiffs must show by their proofs a case of strong and clear injustice, of
pressing necessity, iminent danger, of great and irreparable damage,
and not of that nature for which an action at law would furnish an

adequate remedy." *Eastman* v. *Amoskeag Manf. Co.*, 47 N. H. 71, 78, 80; *Morgan* v. *Palmer*, 48 N. H. 336—339; *Page* v. *Keene*, 49 N. H. 538; *Hodgman* v. *Richards*, 45 N. H. 28—30; *Burnham* v. *Kempton*, 44 N. H. 101; 2 Story's Eq. Jur., 8th ed, sec. 929. "The general principle underlying all the authorities is, that when the remedy at law is ample, equity will not interfere." High on Injunct. 255, sec. 459. "To warrant the interference of equity in restraint of trespass, two conditions must co-exist. First, complainant's title must be established by legal adjudication; and second, the injury complained of must be irreparable in its nature, and, to come within the rule, the injury must be of such a nature as not to be susceptible of adequate pecuniary compensation in damages." High on Injunct. 256, sec. 460. "The proper mode is to classify the cases under two heads; the one where the party against whom the application for the injunction is made is in possession, and the other, where the plaintiff is in possession, and is asking the court to protect his estate." Kerr on Injunct. 287. "The court then states how much more reluctant it is to entertain a suit against a person in possession, than where he is not. The question which party is in possession, is, therefore, of great importance, and ought to be made the foundation of the distribution of the cases." Kerr on Injunct. 289. "The result of these cases is, that when the plaintiff is out of possession, the court will refuse to interfere by granting an injunction unless there be fraud or collusion, or unless the acts perpetrated or threatened are so injurious as to tend to the destruction of the estate. He must also, it would appear, be able to satisfy the court that there is an action pending at law, between him and the defendant in possession, which will try the right as between them." Kerr on Injunct. 289. "And if the title be denied, or in doubt, the injunction will generally be refused against a defendant in possession until the title is established at law." High on Injunct. 255, sec. 458. "The court, when its summary interference is invoked, always looks to the conduct of the party who makes the application, and will refuse to interfere, even in cases where it acknowledges a right, unless his conduct in the matter is free from blame." Kerr on Injunct. 200, 201. "Parties who, possessing full knowledge of their rights, have lain by, and by their conduct have encouraged others to expend moneys, or alter their condition, in contravention of the rights for which they contend, cannot call upon the court for its summary interference." Kerr on Injunct. 201. "Acquiescence by one of several co-plaintiffs, in the act complained of, precludes the interference of the court upon interlocutory application as much as upon decree, and the rule is the same, although some of the plaintiffs are infants." Kerr on Injunct. 201. "If there is anything well established in this court, it is, that a man who lies by while he sees another expend his capital and bestow his labor upon any work, without giving to that person notice or attempting to interrupt him,—one who thus acquiesces in proceedings inconsistent with his own claims, when he comes to enforce those claims in this court, shall in vain ask for its interposition by an injunction, of which

the effect would be to render all the expense useless which he volun-
tarily suffered to be incurred. Here, more years have been allowed to
elapse than the number of weeks which would have closed the doors
against the plaintiff coming to seek an injunction." BROUGHAM,
Chanc., in *Parrott* v. *Palmer*, 3 Myl. & Keen. 632. "A man who seeks
the aid of the court to restrain trespass should show due diligence in
making the application. Whatever may be the original equity of his
case, if a man stands looking on while moneys are being expended by
another upon the faith that no objection will be afterwards made to his
enjoyment of the property upon which the expenditure has been made,
he will lose his right to the interference of the court by injunction."
Kerr on Injunct. 298 ; *Peabody* v. *Flint*, 6 Allen 57, 58;—and see
*Bassett* v. *Salisbury Manf. Co.*, 47 N. H. 440, 443, and cases there
cited.

No injunction can be granted in this case, without setting at defiance
all these well-settled principles, because,—1. There is not now, and
never has been, any suit at law to aid. The plaintiffs have never at-
tempted to settle any question of title at law. Their title is at least
" doubtful." The title is " denied " by the defendant. The bill shows
*they* never had any title. 2. The plaintiffs have received no damage.
The defendant is perfectly responsible. The bill charges no injury.
It does not charge that " irreparable injury " is meditated. The injury
" threatened " would not be " irreparable " unless such trespass to or
occupation of any other building in " occasional " use would be. An
injury meditated to the property of another person, natural or artificial,
is not such injury to them. 3. The plaintiffs are guilty of laches and
bad faith. They were ·fully cognizant of the defendant's possession
since prior to December 30, 1867. They saw him expend $150 there
under a claim of title. The plaintiffs Durgin and Marston have for
many years lived within five miles of the judge who granted the in-
junction of April 18, 1870. It took them but two days to procure and
serve that injunction. They could have done the same and closed the
doors " years " before. They looked on in silence " more years " than
it took days to close " the doors." They slept with their eyes open over
their rights if they had any. They cannot now be heard to complain.

II. The plaintiffs cannot maintain this suit. They have no standing
in court, upon their own showing. They show themselves out of court,
both upon their bill .and upon their testimony. 1. By their bill they
charge that " the East Andover High School Association " is a corpo-
ration duly established—ch. 145, Rev. Stats.—and existing " under the
laws of this state," and put the title to the property in question in that
corporation, not in themselves. 2. They sue in their own right as in-
dividuals, and not in any official capacity or in behalf of others. 3.
The bill gives no " shadow of a shade " of any reason why the corpora-
tion, if it had any occasion, did not bring suit in its own name for the
protection of its property and interests, instead of these volunteers. 4.
The plaintiff Marston is now and has long been the mainspring of the
executive board ; and the plaintiff Durgin, since 1855, has been the

"keeper" "of the sacred key and the great seal of destiny" of the corporation. They have not made themselves or the corporation defendant parties. 5. They have not alleged that they, or any other officers or agents of the corporation, have been corrupt; that they have become the *dummies* of the defendant, or even innocently taken a step adverse to the interests of the corporation or its shareholders. Their own testimony shows that they cannot complain of any act of the corporation or its officers. 6. Their bill fails to show that any "effort" has been made to set the corporation in motion, to secure redress for any wrong committed or meditated. They show in proof that they have taken no steps towards calling any meeting. 7. The bill fails to show that any application has been made to them, or to any other officers or agents of the corporation, or who have been such officers or agents, to secure redress or prevent any injury, and their proofs show that they have done nothing. 8. Their bill fails to show that such effort or application would be useless, and it is apparent from their own testimony that there can be no evidence to support such a charge; for, if their claim is true, that the defendant is not a member, and that there are but one hundred shares as they charge, and they have the ownership of as many shares as they charge, they have not only had for years the control of the corporate machinery, but the power to perpetuate that control for years to come. "A corporation is a person in a political capacity, created by the law, and is a body politic, framed by policy or fiction of law, to endure in perpetual succession, with capacity to take and grant, to sue and to be sued." Wood's Inst. 108, sec. 1. "Several things are essential to the making of a corporation." *Ib.*, ch. 8, sec. 4.

A corporation cannot exist without a corporate name, and the power to seek redress through the courts by suing in that name. A corporation is really a legal or artificial person substituted for a natural person or persons. The power to sue is inherent in every corporation: otherwise it would be destitute of "the capacity of protecting its rights, and of enforcing the just claims in its favor by ordinary judicial process." Ang. & Am. on Corp., secs. 110, 369, 370. "It is equally well settled that corporations may sustain actions for all injuries done to the body corporate, as, if an injury is done to one of the members by which the body at large is put to any damage, it may sue on that account." *Ib.*, sec. 370.

If this corporate person cannot exist without the power to sue because it would be powerless to protect its existence, it is self-evident that such power is exclusive in the corporation, and that whoever wrongs the corporation must be amenable to it, and not to every shareholder in the universe. While the corporation exists, a shareholder cannot take away the power to protect its existence. If one shareholder may usurp this power, all may. A defendant is not answerable for the same act, both to the corporation and to each shareholder. If not, each shareholder cannot sue. A judgment must bind both parties or neither: it must end the litigation as to the matter in suit. But it is

apparent that a judgment—a decree—in this suit cannot bind the corporation which might proceed against the defendant for the same matter as if nothing had happened. Its officers and agents are not the corporation. Their whole power is derived from the corporation, and all the business done by them within the scope of their authority is the business of that corporation, and not of its stockholders or members. "If an action can be brought by one stockholder, it may be brought by the holder of a single share; so that for one and the same default    *    *    thirty-five hundred actions might be brought." *Smith* v. *Hurd*, 12 Met. 383;—see *ib*. 384, 385, 386. "The corporation itself is regarded as a distinct person, and its property is legally vested in itself, and not in its stockholders." *Peabody* v. *Flint*, 6 Allen 55. "The artificial person called the corporation must manage its affairs in its own name, as exclusively as a natural person manages his property and business." *Ib.* 56; *Abbott* v. *Merriam*, 8 Cush. 590. "The views taken in that case [*Smith* v. *Hurd*] are unquestionably correct; and they apply with especial force to that class of corporations whose stockholders have little more power than to elect officers, who when elected are invested by law with the sole and exclusive power of managing the concerns and business of the corporation. *Ib.* 55. "It is unquestioned that, at law, no action could be maintained for the causes set forth, otherwise than in the name and by the authority of the corporation itself. Ordinarily, the same rule will apply in equity." *Brewer* v. *Boston Theatre*, 104 Mass. 386. "It is only from the necessity of the case, and to prevent a failure of justice, that suits in equity in the form of these bills [making the corporation, its officers, and those colluding with them, defendants] are allowed. To justify a suit in this form, the bill must show that suitable redress is not attainable through the action of the corporation. To this extent all authorities agree. There is some diversity as to what will satisfy the requirement." *Ib.* 386, 387.

Nothing can be clearer than that the defendant, if at all, is amenable to the corporation. To institute proceedings against him is, then, clearly within the scope of its corporate power. "If so, the question is properly a subject of internal regulation and management, and the court will not interfere until all reasonable attempts have been made to take the sense of the general body of the shareholders on the matters in question. Before applying to the court, all the means provided by the articles, the deed of settlement, or the act of incorporation, as the case may be, for the purpose of bringing the matter before the general body of the shareholders, must be resorted to and exhausted." Kerr on Injunct. 555, 556.

There has never been a day when the plaintiffs could not have had a meeting of the association called, by the proper officers, if they wished; but instead of doing so, these Rip Van Winkles have slept for over seventeen years. If the officers, upon application, had refused or neglected to call a meeting, they could have had one called at any time by a justice of the peace. Rev. Stats., 288, secs. 11, 12. If such officer

had refused to do his duty, the supreme court, by mandamus or other appropriate process, would have compelled its performance.

We do not mean to be understood that a shareholder can commence a suit in his own name for a trespass actually committed or meditated to the property of the corporation, because the proper officers refuse to call such a meeting, or because when so called the corporation refuses to institute such a suit.

Chancery protects its wards,—the idiot, the daft, and the infant,—from fraud; but it does not supervise the housekeeping details of artificial or natural persons, nor interfere with the discretion vested in the head of the household. It does not, as the plaintiffs seem to think, direct by injunction whether an ounce or a pound of butter, flour, or cheese, a slice or a loaf of bread, shall be bought, or when or how much shall be consumed at a meal, nor does it " prescribe " when the physician shall visit the sick, what his prescriptions shall be, or what medicines he shall give, how they shall be mixed, when they shall be taken, or by what nurse they shall be administered. Even Fisk and Barnard never attempted to practise medicine by injunction. In the absence of fraud and within the scope of their charter, such things, with artificial as with natural persons, must be left, like all matters pertaining to the " internal police " and management, to the good sense and discretion of the governing body. Whether a suit shall be brought, when, where, in what form and in what court, who shall manage it, whether it shall be tried, compromised, or otherwise adjusted, are questions of discretion which no court will revise. If it were otherwise, the entire corporate machinery might be paralyzed, and the whole purpose of the corporation defeated, by the conflict of opinion among the corporators, or the perverseness or obtuseness of a single shareholder. Such a corporation would be Samson shorn of his locks.

Upon this point we call the especial attention of the court to the following extracts from the opinion of that distinguished jurist, Mr. Justice MILLER, of the supreme court of the United States, in *Samuel* v. *Ben Holladay*, 1 Wool. C. C. 400 : " By this course of conduct, they [the complainants, who were stockholders and one of them a former director] have acquiesced in the proceedings taken by or on behalf of Holliday, and are concluded thereby. If a stockholder intends to treat any act of the corporation or of its officers or agents as illegal, he must insist upon his objections before the act is committed. He cannot stand by and see it done, and then hold the persons responsible who have been involved in it." *Ib.* 416. " Nor do they hold such a relation to the only relief which the court can give, as to prosecute this suit as plaintiffs. This objection is fatal in any aspect which the case can be made to assume. The claim of a shareholder to come into a court of equity and ask that the rights of the corporation, which it declines to assert, be protected against injuries inflicted or threatened by third parties, has received of late years much consideration. There is also some conflict of authority on the subject." *Ib.* 417. " But no case is cited, nor does any dictum in the opinion of

this court go the length of asserting, that when a corporation has been injured by a tort or a breach of a contract, or has any right of action, legal or equitable, against a party, an individual shareholder can come into court and prosecute that cause of action because the corporation fails or refuses so to do." *Ib.* 418, 419. "In the case before us, we have no attempt to transcend the powers of the corporation, nor any breach of trust on the part of the directors, but simply a neglect to bring a suit which one of the stockholders thinks should be brought." *Ib.* 419. "We see here that when other parties are concerned the jurisdiction is limited to cases in which preventive remedies are efficient for the protection of rights endangered by the neglect of directors and the threatened aggressions of others. It would be a doctrine attended with very serious consequences if every individual shareholder, assuming the place of the corporation, could decide for it, when actions should be brought to vindicate its supposed rights. Each one of the shareholders might elect to claim a different remedy, and resort to a tribunal different from those chosen by every other, and use the court of equity to enforce his views, regardless of its duly constituted officers, and of all other parties having interests, rights, and powers equal to his own. In such a struggle the real interests of the corporation might be entirely sacrificed. If such a doctrine should obtain, it would be dangerous to deal with a corporation, for, whatever the understanding had with its lawful representatives, no one could be protected from the individual shareholders. If the shareholder is aggrieved by the refusal of the board of directors to accept his views, his remedy is to unite with other stockholders and change these directors; but if irreparable mischief to his interests may ensue in the meantime, equity will administer preventive justice until such time as the will of the body of the stockholders can be ascertained." *Ib.* 419, 420. These views seem to us absolutely unanswerable.

There are cases, not in all respects harmonious, which seem to have been supposed to warrant a different conclusion; but when examined, we think they will be found to rest upon the doctrine of *ultra vires*, or upon the ground that the officers were parties to a corrupt conspiracy to defraud the corporation. We will comment briefly upon the leading cases: In *Pratt* v. *Pratt, Reed & Co.*, 33 Conn. 455, HINMAN, C. J., says,—"When a corporation is about to exceed its powers by applying its property to objects beyond the authority of its charter, it is well settled that a court of equity will grant relief to a minority of its stockholders, who dissent from such use of its funds." In *Gravenstein's Appeal*, 49 Pa. St. 320, THOMPSON (the late chief justice) says,— "Fraudulent collusion between the company and any of its creditors, by which its other creditors or stockholders may be wronged or defrauded, would authorize an appeal to equity."

In *Colquitt* v. *Howard*, 11 Geo. 569, the court says,—" In such a case the averments in the bill should clearly and distinctly give jurisdiction; for equity interferes with great caution with the common law jurisdiction over corporations. In such a bill the corporation must be made a party defendant."

In *Hersey* v. *Veazie*, 24 Me. 12, the court (SHEPLEY, J.) says,—"And until it has been shown to have been incapable of doing it, or to have been faulty, no corporator can assume the right to obtain redress for such wrongs, and to settle for them with the person who has committed them. If the plaintiffs have been injured by these fraudulent acts, they should have taken measures to have the corporation obtain redress for them, and through its action have obtained their own redress."

In *Smith* v. *Poor*, 40 Me. 422, the court (APPLETON, J.) says,—"The directors who fraudulently abuse their trust, and misapply the funds of the corporation, are personally liable to make good that loss. But the stockholders cannot maintain a bill to compel them to account, unless it first appear that the directors refuse to prosecute this suit, or the present directors are the parties who made themselves answerable for the loss. In all cases the corporation is a necessary party, either as complainants or defendants."

In *Bliss* v. *Anderson*, 31 Ala. 621, the court (WALKER, J.) says,— "A stockholder in an incorporated insurance company may file a bill in chancery to restrain the officers of the company from the commission of an unauthorized act, which will not only amount to a forfeiture of its charter, but also subject the company to heavy fines and penalties."

In *Silk Co.* v. *Campbell*, 3 Dutch. 541, the court says,—" The well settled principle that a corporation acts by the majority,—that the will of the majority is the will of the corporation, and to this the minority must yield,—furnishes us with a full answer to this question. * * * By that majority is meant, of course, the legal majority."

In *Vanderbilt* v. *Garrison*, 5 Duer 689, it was held, by BOSWORTH, J., where certain stockholders in a corporation brought an action to recover from a person employed by the corporation, or its agent, money received by him in the course of such agency, on demurrer to the complaint, " that it was bad for want of an averment that the corporation by its officers had refused to bring an action."

It was held, in *The Methodist Episcopal Union Church* v. *Picket*, 23 Barb. 437, that " in an action brought by a religious society the plaintiffs must aver their corporate existence," &c.

In *Colquitt* v. *Howard*, 11 Geo. 565, the court (NESBIT, J.) says,— " But the proposition, which covers the whole case, is this : By accepting the act of incorporation, the title to these water lots vested in the corporation. Major Howard's title to the one fourth, as tenant in common, was of course divested ; and these things being so, no person can sue for the injuries done or anticipated but the corporation. That the Water Lot Co. can sue for these trespasses there is no doubt."

In *Bradley* v. *Richardson*, 2 Blatch. C. C. 345, 346, the court says,— "When the corporate rights and interests are affected in any way wrongfully and injuriously, those rights and interests, generally speaking, and unless some special grounds be shown, must be asserted and defended, both at law and in equity, in the corporate name. Now, the bill does not state any fraud or collusion with the judgment creditors on the

part of the Mill Co., but, on the contrary, it alleges that the judgments were obtained without the consent and against the will of the company, and were a fraud upon the company.   In that aspect of the case, it would seem that the company, in its corporate name, would be the proper party to seek relief against the judgments."

In *Arkenburg* v. *Wood*, 23 Barb. 370, the court says,—" No corporation or tax-payer, individually, or on behalf of himself and all others, can sue for an injury to or a misapplication of the corporate property or franchises, except in cases of fraud, corruption, or violation of law on the part of the functionaries entrusted with the corporate powers and duties."

Chancellor WALWORTH say,—" Generally, when there has been a waste or misapplication of the corporate funds by the officers or agents of a company, a suit to compel them to account for such waste or misapplication should be in the name of the corporation.   But as this court never permits a wrong to go unredressed merely for the sake of form, if it appeared that the directors of the corporation refused to prosecute, by collusion with those who had made themselves answerable by their negligence or fraud, or if the corporation was still under the control of those who must be made the defendants in the suit, the stockholders, who are the real parties in interest, would be permitted to file a bill in their own names, making the defendant a party defendant; and if the stockholders were so numerous as to render it impossible, or very inconvenient, to bring them all before the court, a party might file a bill in behalf of themselves and all others standing in the same situation." *Robinson* v. *Smith*, 3 Paige 232, 233 ; *Cunningham* v. *Pell*, 5 Paige 612. " In this case, it is charged that the funds of the bank have been fraudulently abstracted to a large amount by the two Pells, so that nothing is left for the payments of the creditors of the institution, and has recovered a judgment which is probably binding on the corporation." *Cunningham* v. *Pell*, 5 Paige 612.   " But it is a fatal objection to all the relief claimed by this bill, that the corporation is not made a party." *b.* 613.

Assuming, for the purposes of the argument, that the reasoning of Judge MILLER in *Samuel* v. *Holladay* is unsound,—without foundation,— the plaintiffs cannot stand a moment upon the cases just cited.   First, because they have failed to aver that they or any other officer or agents of the corporation are corrupt, engaged in a conspiracy, have committed a breach of trust, have violated any law, transcended their powers, or intend to do either ; and second, their own testimony shows conclusively that there is no suspicion, much less proof, to sustain such charges if set out.   Assuming, further, that if a shareholder takes any steps towards having a meeting called, or otherwise to set the corporate machinery in motion, he thereby becomes invested with supreme authority, as far as lawsuits are concerned, and can sue when, where, whom, and for what he pleases, and can adjust the same as he sees fit, and conclude the corporation thereby, they fail utterly to bring themselves within the rule, because, upon their own testimony, there is no.

pretence that they have done anything. Throw the reins upon the neck of the law by the assumption that it is not necessary to take any steps to have a meeting called, or to set the corporation in motion, if such steps would be useless, and these plaintiffs stand no better; for their own testimony shows that they can complain of no officer or agent of the corporation, except themselves, and, to do the plaintiffs simple justice, they make no pretence that they have any occasion for complaint.

In *Foss* v. *Harbottle*, 2 Hare 495, Vice-Chancellor WIGRAM says,— "There is no suggestion that an attempt has been made by any proprietor to set the body in motion, or to procure a meeting to be convened for the purpose of revoking the acts complained of," &c.

In *Mozley* v. *Alston*, 19 Eng. Ch. 797, that great English-American jurist, Lord LYNDHURST, says that he "fully concurs" in the opinion of the vice-chancellor, in *Foss* v. *Harbottle*, in relation to the remedy.

In *Brewer* v. *The Boston Theatre*, 104 Mass. 378, 387, 388, 389, 392, 393, the court says,—"A bill in equity by stockholders of a corporation, in behalf of themselves and the other stockholders, for fraud and conspiracy, whereby the interests of the corporation have been sacrificed, brought against the corporation and persons who were its directors in former years, and others, cannot be maintained if it does not show either that an effort has been made to set the corporation in motion to redress the wrong, or an application been made to the board of directors in office at the time of bringing the bill, or that such effort or application would be useless; and this requirement is not satisfied by an allegation that a majority of the directors are acting in the interest and under the control of persons charged with the fraud."

The bill and answer agree that but one hundred shares of stock were issued, and as to the purposes for which the stock was issued; but in their proofs the plaintiffs claim rights by virtue of pretended certificates of subsequent issues of stock. They claim that the secretary issued such stock, but do not pretend that he had any authority so to do, from any source, unless he had it by virtue of his office. This spurious stock was issued to those who made "donations" to the corporation.

If at all, the legal life of this corporation must have commenced at the adoption of its constitution and organization under it, May 4, 1850. If the plaintiffs are stockholders, they must have become such on or after that date.

The constitution provides,—Article III. "The funds of this society shall be divided into shares of five dollars each." Article IV. "Each person subscribing one share to the funds of this society shall be a member thereof." Article XII. "There shall never be any assessment made on the shares of the property of this association, and all moneys needed for any future purpose shall be raised by subscription." Article XIII. "The executive committee of this society shall be authorized to take charge of any donation or bequest made to this society, and appropriate it agreeable to the donor's request."

The plaintiffs had the right to make such donations to the corporation as they saw fit. The constitution provided for the acceptance of

such donations. The fact that they received stock certificates is immaterial. A donor is not entitled to certificates. The records of the corporation show that the association never authorized the issue of such certificates. The clerk had no authority to set up a certificate manufactory.

The 12th article of the constitution provided that " All moneys needed for any future purpose [manifestly meaning all required after the $500 for the building] shall be raised by subscription." Subscription here evidently means by donation, or, as it is termed in the records of proceedings for May 7, 1853, " a private subscription." The exhibit appended to Marston's deposition, and the regular proceedings, show that two or three donations were made in this way. The donors were not entitled to stock or stock certificates, and yet some of these plaintiffs claim to own certificates because they made these unequivocal gifts to the corporation. The term subscribing, as used in Article IV, has some meaning. What is it? It cannot mean that one who makes a gift is a subscriber for stock. Bachelder seems to have no impression, even, that he ever subscribed for anything.

The plaintiffs, Bachelder and Marston, in their report as executive committee, made May 7, 1853, which was adopted by the association, say that " The Ladies' Sewing Society have most generously furnished the institute with blinds. * * We think they are at least entitled to a vote of thanks for their generosity and interest." Were they entitled to stock for this donation as well as thanks? If so, why did not the plaintiffs give it to them? They further say in this report,—"A private subscription has also been raised, amounting to sixty or seventy dollars, for decorating the building with a bell and belfry." If they meant that they had issued stock to themselves for this donation, why did they not say so? If the plaintiffs, Marston and Bachelder, became stockholders in the corporation by embracing " a chance for the liberal," and paying respectively the sums of $5 and $10, why is not the defendant a stockholder by the expenditure of $150 for other, but necessary, repairs upon the same building? If he had been the executive committee, perhaps he too might have voted himself stock, and enjoyed the credit of immense liberality at the same time. The directors, when this stock was issued, utterly fail to explain the mysteries of its creation, or how they came to have stock for " private subscriptions " or donations. They have hatched a sphynx or a Chinese puzzle, which they will not or can not explain. It will be observed, that the plaintiff Bachelder has been careful not to put upon the stand his brother-in-law and intimate friend George E. Emery, the secretary who issued these certificates, to explain by what authority they were issued, why they were issued to those who had made donations, and why they were issued to a few who had contributed towards the belfry, etc., and not to the many who had done precisely the same thing, in exactly the same way.

The answer is obvious. A gift is not a sale. Donors are not entitled to stock. If one is, all are. No honest explanation could be given without damaging the plaintiffs.

III. The bill should be dismissed with costs. The bill is a nondescript. It is neither fish nor flesh. Its allegations remind one of

> "The people, ah ! the people,
> They that dwell up in the steeple ;
>    *     *     *     *     *     *
> They are neither man nor woman ;
> They are neither brute nor human ;
> They are Ghouls.

Aside from the defects we have pointed out, the first and last instalments make this distinctively a bill for relief. The middle part contains a stump .speech, a smell, a fishing bill, a prayer for discovery, and another for Fisk's writ. Under the English practice, the bill is clearly demurrable. *Currier* v. *Concord Railroad,* 48 N. H. 330. If it is a bill for discovery, it should be so dismissed :

1. Because we have answered and " disclosed the information sought," so far as we were able. *Dennis* v. *Riley,* 21 N. H. 51. Such is the undoubted rule in chancery. *Ib.* 51.

If there be an exception, which we deny, they must establish it, and bring themselves within it. At most, they can only claim as an exception that they were " entitled to the discovery, and went first to the defendant who refused, and the plaintiff was thereby compelled to come into chancery for the discovery." *Ib.* 51.

They fail entirely to bring themselves within such assumed exception. Their bill charges " that, though requested, the said defendant refuses to allow the plaintiffs or their solicitors to see or examine said book of records." This the answer denies, and their own testimony proves to be false. The answer says, " that though absent professionally some of the time, he resides in the same town with the plaintiffs, and within a very short distance of two of them ; that during the three years or more that said records have been in his possession, said plaintiffs have had abundant opportunities to apply to him for an inspection of said records, but that during all that time, aside from the injunction itself, up to August 13, 1870, no intimation whatever has ever been made to him, or in his presence, by said plaintiffs, or either of them, that they had any desire for such inspection ; that he has at all times been willing for said plaintiffs, or either of them, to make a proper inspection of said records, and make any transcripts thereof which they deemed proper ; that no application has ever been made to him for that purpose by the plaintiffs' solicitors or either of them ; that upon the statement of the solicitors of the plaintiffs, on said August 13, 1870, that they desired to examine said book of records, and make transcripts thereof, he promptly placed the same in the hands of his solicitor, who, as he is informed and believes, in pursuance of his instructions, forthwith placed said records in the hands of the plaintiffs' solicitors."

Their own testimony shows that two of the plaintiffs live in the same village and near to the defendant ; that two of them were on pleasant and friendly terms with him ; that they knew of his business, of his

absence from home, and that his brother, Abel B. Durgin—not his wife—acted as his agent, and had charge of his business there; that they understood he had the records "about April 18, 1870," when they went to consult counsel; that neither of them ever gave the defendant, directly or indirectly, any intimation that they desired to inspect said records; that they stated the facts to their counsel; that "Mr. Pike asked me [Clark Durgin] to go to Mr. Durgin, the defendant, and ask him if he had them, and if he had, to ask for them, or for leave to make copies of them. I told him that the defendant didn't like me very well, and I would rather not go. I thought it would be better for some other one. I think Mr. Pike said, Very well, we will see to it, or gave me to understand that they would look after the matter." See Clark Durgin's Dep., Ints. 116, 126, 127; Dep. of William A. Bachelder, Int. 55; Dep. of William S. Marston, Ints. 16, 20, 25, 71, 73; Dep. of I. N. Blodgett, Ints. 15, 16, 21, 22, 23, 26, 28, 30.

Able counsel at once pointed out to the plaintiffs that the proper course was for one of them who lived nigh him to make a personal application to the defendant for an inspection. True, Mr. Pike was careful to direct the plaintiff Durgin to go, and when he declined because of the ill-will between him and the defendant, was equally careful not to suggest that Bachelder or Marston, who were on pleasant and friendly terms with the defendant, should go. The reasons will be seen further on.

The temporary injunction was granted April 18, 1870, without bond or security of any kind, "provided the said complainants shall, within forty days, file a bill in chancery in said court in this case." The time expired May 28, 1870. The court commenced it session June 7, 1870. No steps were taken by the plaintiffs or their counsel to inspect records, or do anything else, until a week after the time limited in the order had expired. At the June term, 1870, the plaintiffs were driven by the counsel for the defendant into filing the bill on or before July 1, 1870. No attempt was made to make service on the bill until August 10, 1870, just prior to a hearing on the petition of the defendant for a dissolution of the temporary injunction. The purpose of the delay is apparent. For most practical purposes, it effected a postponement of the cause to December. Neither the plaintiffs nor their counsel, either by letter or otherwise, for months, made any application of any kind, either to the defendant or his counsel. The defendant had to pass from New York to his home through the place where the plaintiffs' counsel lived. They could not help seeing him in the cars unless they shut their eyes, or were blind. They neither wrote him, went to the depot for him, or sought him out, or spoke to him in the trains. The reason is obvious. They did not try "first to get the discovery in the way in which men acting with each other ought first to ask their rights." *Dennis* v. *Riley*, 21 N. H. 51. The senior counsel sends the junior counsel, who was an entire stranger, to the defendant's wife, and whose name, even, she had in fact never heard. He swears that he first went to the house of the plaintiff Durgin, and had a consultation with him.

He could not have failed to learn of the defendant's absence at that consultation. He called upon the defendant's wife. He did not get the records, but did, as he finally puts it, get, "from what she said," the understanding "that he was not willing that the other side should see the book, or at least not in his absence." Dep. of I. N. Blodgett, Ans. 48. We do not question that Mr. Blodgett means to state the transaction as it took place. But we understand that three fourths of the conversation does not appear in his testimony, and that, in respect to the matters in hand, she simply told him that her husband didn't allow strangers to meddle with his papers in his absence. But they make no case upon their own showing. If there be an exception to the general rule, they have not brought themselves within it.

In *King* v. *Clark*, 3 Paige 74, the chancellor says that a "refusal" by the proper party even to avail "to give the desired information" must be under such circumstances as show that it was "without sufficient excuse."

A man's wife may be his agent in matters pertaining to the charge of his household, but she is not his attorney. She does not control his lawsuits. Where there is no fraud, the application must be made to him, or, perhaps, under special circumstances, to his counsel. The plaintiffs cannot stand upon a bill of discovery, under the notorious circumstances disclosed in this case. They cannot wait for months till the husband is absent, and then make a case by making a demand upon a wife, which no intelligent woman, mindful of her own and her husband's interest, and fit to be the wife of a decent man, would grant.

The testimony of Mr. Blodgett as to what the defendant's wife said and did is palpably incompetent. Under our statute she was a competent witness. They should have put her upon the stand. They cannot make a case, when no application of any kind was ever made to the defendant or his counsel, by putting in second-hand heresay in this roundabout way. See the opinion of the supreme court of the United States, December term, 1872, by Mr. Justice DAVIS, in *Young* v. *Godbe* (Chicago Legal News, July 5, 1873), 15 Wall. 562.

2. The bill charges that the defendant "claims to have obtained a title to the land on which said building stands," and prays "especially that he may answer and set forth what title he has to the said land, if any, and when and from whom the same was obtained." This makes no case for a discovery, first, because the plaintiff has no right to pry into the title of his adversary—4 Bouv. Inst. 111; and, second, because the defendant's deed from Osgood had been duly recorded in the registry of deeds for Merrimack county since November 5, 1867. Such a bill cannot be based upon the plaintiffs' indifference, neglect, or laziness, or their disinclination to pay fifty cents, the register's fee, for a copy. The plaintiffs were chargeable with the contents of the public registry. They might as well ask us to discover the contents of deeds in their own possession.

3. The foundation of a bill of discovery is to gain evidence which is "exclusively within the knowledge of the parties, and which cannot

be obtained because it is a rule at law that the parties in such case cannot be examined." 4 Bouv. Inst. 108 ; *Norton* v. *Woods,* cited in *Robinson* v. *Wheeler,* 51 N. H. 386 ; *Tappan* v. *Evans,* 11 N. H. 324 ; *Eaton* v. *Farmer,* 46 N. H. 201, 202.

Since the General Statutes, secs. 13, 14, 15, p. 428, and subsequent statutes, the testimony of all parties can be taken, so far as now occurs to us, in all cases where a bill of discovery would lie. The plaintiffs rely on a rule which does not apply. The reason of the rule allowing such bills has ceased to exist. We suggest that since the passage of these statutes no bill of discovery lies. Such was the reasoning of Judge DILLON and some other authorities upon this point, which we have mislaid, but hope to be able to furnish to the court.

4. The objections heretofore taken, that the plaintiffs, both upon the bill and their proofs, fail to put themselves *rectum in curia,* are as applicable to bills of discovery as for relief. For these reasons, and many more which might be suggested, we urge that, even if bills of discovery are allowable, they ought not now to be favored. It was as much the duty of the plaintiffs to go ahead with their briefs, as with their bill or testimony. They have been requested to furnish us their points even, but, aside from promises, their response has been blank silence.

We perhaps ought not to complain of this, as the settled rule seems to be that the statutes and rules of court apply in this section only to the writer hereof. But, as in the hereafter, counsel will attempt to take the court over some tortuous path, up " an exceeding high mountain," we refer to the fact that we may not be precluded from showing that the plaintiffs do not own all the kingdoms of the earth, and therefore have as little title as the guide of whom the Scripture speaks.

SARGENT, C. J. It appears that in 1850 the plaintiffs and divers other persons, residing in or near the village of East Andover, formed themselves into a voluntary association by the name of the " East Andover High School Association ; " that they adopted a constitution and by-laws, and gave due notice of the formation and purpose of the association ; that the sum of five hundred dollars was subscribed, and that one hundred shares of stock, of the par value of five dollars each, were voted and created by the association, and taken by the members thereof.

That May 20, 1850, one Joseph Osgood conveyed by warrantee deed to said association a tract of land " for an academy building location, and to be held by them *for that or any other purpose, except a private dwelling-house ;* " that in the year aforesaid the said association erected upon said lot a building, to be used as a school-house and hall for the general accommodation of the village of East Andover ; that, from the time of its erection down to the latter part of the year 1867, the said building was used for the purposes intended by the association ; that in that year the defendant, having obtained a quitclaim deed of the association land from the original grantor, Osgood, and having become the owner of the larger part of the stock, took possession of said building,

and has since retained the possession, and that the defendant also obtained, and has since retained and still holds, the records of the association; that after 1852 but little use of the building had been made up to 1867, and that no legal meetings of said association have been held, nor any officers chosen, since 1856.

That after the defendant had the possession of the house he made repairs thereon, as he alleges in his answer, but that he never consulted the other members of the corporation concerning them, and never invited such members, or any of them, to assist him in making them, and that these repairs were of such a character as would be beneficial to all the members of the association as such; and also, that the defendant took his deed with full knowledge of the existence and terms of the deed to the association, and neither Osgood nor the defendant understood that anything passed by said deed, except the right of reversion in the land subject to the title conveyed to said association.

That the plaintiffs were original members of said association, and own a certain number of shares therein, the only question being as to how many shares they own.

That, at the time of the service of the injunction upon the defendant, he was intending to remove the building of the association upon his own land and convert the same into a dwelling-house, claiming that he had the legal right so to do, but which claim we do not find to be well founded.

The charge that he refused all access to the book of records in his possession, though supported to a certain extent by the evidence, yet we think was excusable under the circumstances; and, as he has since given every proper means of access to said records, we think the objects of the bill have been fully answered in that particular, and that the information sought has been furnished. There is no evidence before us that anybody, except these plaintiffs and this defendant, owns any of said original stock in said association, or claims any of the same.

In this case, upon these facts, it seems to be clearly a case of injustice to these plaintiffs, of pressing necessity, of imminent danger, and of great and irreparable damage, and not of that nature for which an action at law would furnish any adequate remedy. The defendant was intending to remove this building and convert it into a dwelling-house. This would be unjust to the plaintiffs if they have rights therein, and wish to have the building remain for the purposes for which it was originally designed. So far as appears, they had no way to prevent its removal but by obtaining the injunction, and the loss to them would be of that character which may properly be termed irreparable, and it is difficult to see how any action at law would furnish them any adequate remedy.

The defendant, having obtained the reversionary right in the land, has a direct interest, personally, in conflict with his interests as a member of the association, and in conflict with the interests of these plaintiffs as members of the same association. He, also, having purchased in a large majority of all the shares of stock, might easily

control the association; but he should not be allowed, either as an individual outside, or as a member of the association having a controlling interest, to deprive the other members of the same association of their rights of property, or the privileges secured to them as such members by the deed which conveyed the land for the location of the building of said association.

This is not a case of a doubtful or uncertain right. Here the plaintiffs' rights are not only asserted, but proved beyond question. The fact that there may be some dispute as to the number of shares owned by the plaintiffs is not material. If their right to fourteen shares is established, as it is in this case, then they are entitled to have those rights protected just as much as though they owned twenty-nine shares. The right to certain shares being established, establishes the plaintiffs' right and title; the only question is, to how much? The question is not one of right, but as to the extent or quantity of the interest.

And in such cases it can make no difference who is in possession of the premises for the time being. It is only where the right is in question, that possession gives any advantage to the person enjoying it. There is no need of a suit at law, unless there is a right or title in dispute. Here the right is established, and although the plaintiffs have not been damaged because the building has not been removed, yet that is the very injury which the plaintiffs seek to prevent by this injunction. The defendant being in fact the corporation, or owning a great majority of its stock, as he claims and as the evidence tends to show, should at least have observed the forms of law, and procured a vote of the association before he attempted to destroy its property; for a removal of this building and the conversion of it into a dwelling-house would amount to a destruction of it, to all intents and purposes, so far as the association, or so far as the rights of these plaintiffs, are concerned. Whether, if he had caused a meeting of the association to be held, and procured a vote to authorize him to do just what he was intending to do in this case, it would then have been legal and proper to have done so, is a question which does not arise here.

We think, therefore, that the first two reasons given by the defendant's counsel why an injunction should not be granted, do not apply; and the third, that the plaintiffs have been guilty of laches or bad faith, does not seem to be well founded. The plaintiffs were not bound to object to any repairs being made upon the company building, by any member of the association who chose to make them, so long as such repairs were proper and necessary for the use of the building, in the manner in which the association had used it and might properly use it; but as soon as it was ascertained that anything was contemplated which was adverse or hostile to the interests of the association or its members, then was the time for objection to be made,—and in this case it was made promptly. As soon as it was learned that the defendant intended to remove the building and convert it into a dwelling-house, this proceeding was at once commenced and a temporary injunction at once obtained. That seemed to be a case requiring immediate action; and it

would probably have been equally useless and fatal to the plaintiffs' rights to have delayed or waited to call a meeting of the association, for before that could have been done, the removal would have been made, and the whole thing done and accomplished.

The necessities of the case were such as to preclude the possibility of the plaintiffs having called a meeting and procured a vote of the association before acting; and then, the other facts in the case, which are now disclosed, that if such meeting had been called it could have been controlled by this defendant, he being the owner of a majority of all the shares in the association, would have rendered such meeting useless: but the first of these reasons seems amply sufficient to justify the plaintiffs in their action. The plaintiffs have slept upon no rights that seemed to be invaded or threatened. They were not called upon, as we have seen, to object to repairs being made on the building, which were not inconsistent with its use by the association; but as soon as danger was discovered, it seemed to be so imminent that the plaintiffs could do nothing more nor less than they did do in season to avert it. We think the evidence shows that any effort or attempt to procure any action of the association, as such, after the intention to remove the building was discovered, and before obtaining the injunction, would have been entirely useless.

But it is urged that this bill cannot be maintained, because the plaintiffs have not brought their bill, not only upon their own account but in behalf of others who might desire to come in and become parties. But, in the first place, it does not appear affirmatively that there are any other parties interested in this association except the parties to this bill, and, from the whole case, we infer that there are no shares of stock outstanding to which these parties have not either the legal or the equitable title.

But it is further urged that the bill cannot be maintained, because the plaintiffs have not made the corporation or the association a party defendant in this proceeding. There is no question about the ordinary rule in such cases, that the association or the corporation should be made a party. This defect, if it was one, was apparent upon the face of the bill, and perhaps upon demurrer,* there being nothing else shown, the bill might have been held insufficient; but the answer is full and responsive to the bill, discloses the information sought without objection to the form of the bill or for any want of parties, and the evidence and answer disclose the facts as we have before seen, that, under the circumstances of this case, nothing would have been gained by that course; and, further, our statute authorizes the granting of " writs of injunction whenever the same is necessary to prevent fraud or injustice." . Gen. Stats., ch. 190, sec. 1.

It is difficult to see why this is not just the case where injustice to the rights of these plaintiffs, as members of this association, is threatened, and should be prevented; where the delay that would be necessary to obtain any vote of the society, situated as this is shown to be,

---

* *Winsor* v. *Bailey*, 55 N. H. 218.

would be fatal to the plaintiffs' case, and, also, that to have made the association a party defendant would have been entirely useless. The plaintiffs had sufficient interest in the subject-matter to justify them, in commencing this proceeding, to find out the facts in the case in regard to the defendant's ownership and claims in this property of the association, and sufficient interest to authorize them to ask to have the property in which they were thus interested protected from destruction or removal.

And this defendant certainly is in no condition to complain that other parties are not added to or contained in the bill, when he is assuming to act as the whole association, or as though there were no association, and takes entire control of this property, and uses it, or is about to use it, as his own, in such a way as to prejudice the rights of these plaintiffs as members of such association. They certainly ought to have the right to protest, and to prevent such use of the company property and such sacrifice of their rights, at least until the association can be legally organized by the election of proper officers, and its powers and wishes properly ascertained; and then, if either party, the present plaintiffs or the defendant, shall conclude to institute other or further proceedings to assert their rights, they can proceed in such a way, and make such persons and associations parties to their proceedings as are necessary. But so far as this bill is concerned the defendant has answered it fully, without objection, and given the desired information, and the plaintiffs have shown such a case as, under the provisions of our statute, entitles them, we think, to the injunction prayed for, or, rather, to an injunction such as we propose to grant.

The jurisdiction of equity, "at the instance of a shareholder, is, to apply preventive remedies, by injunction, to restrain those who administer the affairs of a corporation from doing acts which amount to a violation of the charter, &c. It also extends to inquiring, concerning, and enjoining, as the case may require, individuals, in whatever character they may assume to act, from prosecuting any course of conduct which is in violation of a corporate franchise, or in denial of a right growing out of it, when for the injury which will result there is no adequate remedy at law. * * If a stockholder is aggrieved by the refusal of the board of directors to accept his views, his remedy is, to unite with other stockholders and change those directors. But if irreparable mischief to his interests may ensue in the meantime, equity will administer preventive justice until such time as the will of the body of the stockholders can be ascertained." *Samuel* v. *Holladay*, 1 Wool. C. C. 400, 420.

The defendant is enjoined and commanded not to remove said academy building, nor to convert the same into a dwelling-house, without the consent, in writing, of all these plaintiffs, or until this court shall order or permit the same to be done in some proceeding to which the said association shall be made a party.

*Injunction granted.*