HENNESSEY v. WALSH.        {Aug. 12, 1875.

*Proof of special trust—Resulting trust—Pleading—Roman Catholic church—Jurisdiction.*

It appeared that the land on which the Catholic church and parsonage in Portsmouth stands was vested in the defendant Bacon, bishop of the diocese, no trust being declared in writing. *Held,* that no special trust could be proved by parol.

It appearing that the funds with which said land was bought and buildings erected had been furnished for that purpose by subscriptions and contributions made to the priest in charge for the time being, under the law, usage, and polity of the Roman Catholic church, by Catholics and others resident in Portsmouth and elsewhere—*Held,* that no trust resulted to the society or congregation worshipping in said church.

*Held,* that the plaintiffs could not maintain their bill by virtue of Gen. Stats., ch. 139, sec. 5, because, assuming that the said congregation or society could, under said statute, be considered as having corporate powers, these plaintiffs could not maintain their bill for the protection of the *quasi* corporate rights, because it did not appear that they had any authority, and that they could not maintain the bill for the protection of their own interest in the *quasi* corporate property without alleging that the society was fraudulently neglecting to protect its own rights, and making the society a party defendant.

The defendants having stated in their answer, that, by the law, usage, and polity of the Roman Catholic church, the title to all lands used for religious purposes, churches, &c., is vested in the bishop of the diocese in which the same are situated, for the use and benefit of the universal Catholic church, and that all gifts and contributions for such purpose are understood to be made under that rule, and that these gifts and contributions were made under that rule, and it having been found by the court that the legal title to the property was vested in the defendant, the bishop, without any written declaration of trust, and that he was accountable only to his ecclesiastical superiors—*Held,* that the said defendant was not accountable in this suit for his management of the property; and it appearing that the defendant Walsh had acted under the bishop's direction—*Held,* that he was not accountable in this suit. *Held,* that this court had no authority to take this property from the bishop, and place it in the hands of a new trustee.

BILL IN EQUITY. The bill states that McCallion held the church and parsonage in trust for the purpose of a place of public worship for all the Catholic residents of Portsmouth and vicinity, and for all persons, desirous of attending services in the Catholic form, to attend the public

worship therein, to be had according to the Catholic religion and for the conversion of the people to that faith, and that said church was to be a free church, where all people desirous of doing so might attend public worship without price.   It also states that all the funds contributed afterwards to McCallion and his successors for repairing, enlarging, and insuring the church, were contributed for the same trust; that McCallion had abandoned the trust; that the defendant Bacon had received the insurance money; that the defendant Walsh, under Bacon's direction, had rebuilt the church, assuming the whole control and excluding the members of the society from any voice or part in the matter; and that he had excluded from the services of the church those who had not in some way contributed, unless they paid an admission fee.

The bill further charged, that the defendant Walsh had been guilty of using harsh and indecent language, communications, and threats against those members who would not contribute.

The prayer of the bill is as follows:

" Wherefore the plaintiffs pray, that the said Walsh and the said bishop, having assumed the place of trustees illegally and wrongfully, and their successors and assigns, be ordered and decreed to account for the disposition of the said insurance money and the said trust-fund which have come into their hands from the plaintiffs and all other persons, so the plaintiffs and all the subscribers to said fund may know where and how their trust-fund is invested, and where to find it hereafter in case of renewed trouble or perversion thereof, so the same may not be all squandered and lost, and that the said defendants Walsh and bishop, and their successors, be ordered and decreed to keep said church and land, and the avails thereof, for the purposes of said trust, and for such trustee as this court shall appoint, and for public worship of God in said Portsmouth and vicinity, according to the Catholic faith, free to all whenever services are held therein, whoever pays for such services ; that a new trustee be appointed by the decree of this court to take charge of said trust-fund, and to see that said trust is enforced; that said Walsh and said bishop, and their successors in the priestly office over said church, be ordered and decreed to permit any person to attend the public worship of God whenever religious services are held in said church, and to occupy such seats as are not sold or let, or to occupy the aisles, as they choose, and not to charge any price of admission to such public religious services so long as a single subscriber to said trust-fund, who has subscribed for the purpose aforesaid, objects, and to order and decree otherwise in reference to the premises as may be just and right to protect all parties.   And whereas the plaintiffs cannot now attend said church without strife and contention and without being ejected therefrom, may it please your honors to grant to the plaintiffs a writ of injunction, to be directed to the said Walsh and the said Bacon, and their successors in the priestly office aforesaid, and their aiders, servants, and abettors, strictly enjoining them from preventing the plaintiffs and their families, and all persons desirous of attending the public worship of God according to the

Catholic faith when held in said church, from attending said services freely, and without money or price, and enjoining them from debasing the altar of said church from the worship of God to a place where a price of admission is charged, and curses, disease, and death are asked for to fall upon members of the church and people, who, in worldly matters, decline to follow just as the priest and bishop direct; and for such other relief as may be just."

The answers substantially stated, that, by the law, usage, and polity of the Roman Catholic church, the title of lands used for religious purposes, churches, &c., is vested in the bishop of the diocese for the use of the universal Catholic church, and all gifts and contributions for such purposes are understood to be made under that rule; that the purchase-money of the land on which the church and parsonage were erected was given under that rule, and also all the money that had afterwards been contributed towards repairing, enlarging, insuring, and rebuilding; that the defendant Walsh was accountable only to the defendant Bacon, and the defendant Bacon only to his ecclesiastical superiors; that they had full authority to rebuild, as had been done, and were accountable to no person but their ecclesiastical superiors. They denied that there was any trust for the purpose of a free church, and said that the public worship could not be supported on that plan. The answer denied all improper conduct on the part of the defendant Walsh, but also said that the matters complained of were matters wholly of ecclesiastical jurisdiction. The bill and the answer are much abridged in the foregoing statement, which, however, contains, in connection with the statement of facts found by the court, all that is necessary for the understanding of the questions raised and decided.

This cause having been tried by the circuit court before RAND, J., it was agreed that it should be transferred upon the bill and answers, and the material facts found by the court. The facts found are as follows:

On June 15, 1852, Charles McCallion, a Catholic priest, was stationed at Portsmouth, by the appointment of J. B. Fitzpatrick, bishop of Boston, within whose diocese was the city of Portsmouth and vicinity. There was at that time and ever since has been at Portsmouth and in the vicinity a congregation of Roman Catholics, who have worshiped at Portsmouth under the ministrations of said McCallion and his successors. They have never had any corporate organization under the laws of this state. McCallion undertook to build a church for the use of the Catholics of Portsmouth and its vicinity, and on the said June 15, 1852, purchased a lot of land for that purpose of George M. Marsh for $1,500. He paid $200 in cash, and gave a mortgage for the balance of the purchase-money. McCallion then took subscriptions and contributions from his congregation and others, and erected a wooden church upon the land, which was used by him and his successors as a Roman Catholic church till it was burned in November, 1871. McCallion was named as defendant in the bill, but the bill was not served on him, and he did not appear. The mortgage remaining unpaid, it was, on June 8, 1857, assigned to D. W. Bacon, bishop of Portland, and one

of the defendants, to whose diocese Portsmouth and the vicinity had been in the mean time transferred. The assignment was recorded in the records of Rockingham county, on June 13, 1857, and Bishop Bacon has ever since continued to hold the mortgage. On November 22, 1853, one Owen Martin, having recovered judgment against McCallion, levied his execution on McCallion's equity of redemption in the premises, and the same was conveyed by sheriff's deed to Martin for $162.62; and he afterwards, on May 14, 1855, conveyed the same for $238 to Bishop Fitzpatrick, within whose diocese Portsmouth then was.

By the usages of the Roman Catholic church in New England, all church structures are held in the name of the bishop for the use of the congregations who respectively attend public worship therein. The legal title is vested in the bishop. No trust was expressed in any of the conveyances above referred to; but the money was furnished by the people, not by the bishop. The bishop appoints the priests to the several parishes in his diocese, and removes them at his pleasure. Any misconduct of the priest is corrected by complaint to the bishop, who is himself answerable to his ecclesiastical superiors. Soon after the erection of the church above named, McCallion was summoned to another diocese, and Patrick Conovan, D. W. Murphy, and the defendant T. C. Walsh, were successively appointed by Bishop Bacon to the office of parish priest at Portsmouth. They successively occupied the church under Bishop Bacon up to the time of the filing of the plaintiff's bill. They also repaired and enlarged the church building from time to time, and procured insurance upon it in the name of Bishop Bacon; and for these purposes they used money obtained in the church by contributions for the support of the church and its services, pew-rent, special subscriptions, and sometimes their own private funds. Most of the plaintiffs, if not all, contributed to these objects,—some of them quite largely. But what precise sums were contributed by each, and for what particular object these sums were expended, did not appear. All these sums were collected by the priests, and it did not appear that any account was ever rendered to the congregation. But the sums were contributed to provide a regular Catholic service in Portsmouth, and upon promises by the several priests that such a service should be secured to the people.

The defendant Walsh was stationed at Portsmouth on June 11, 1869. In September, 1869, he procured insurance on the church in the sum of $9,000 in the name of Bishop Bacon, paying the premiums partly by money collected in the usual manner, and partly with his own money. The church was burned in November, 1871, and the insurance was collected to the amount of about $8,400 by Bishop Bacon, or in his behalf. Soon afterwards the defendant Walsh undertook to build a new church upon the same site, and set about getting subscriptions for that purpose. He also called a meeting of the members of his congregation, at which time a committee was chosen to assist in the undertaking, and also a treasurer was chosen. Three persons were nominated by the defendant Walsh, and approved by the vote of those

present.    Differences soon arose between the committee and the treasurer on the one part, and the defendant Walsh on the other. These differences grew out of the opposing claims of the two parties as to the control of the funds to be collected, and as to the plan of the church to be built.

· The defendant Walsh claimed, substantially, that he should handle the funds, and dictate as to the kind of church to be built; and he procured plans to be made without consulting the committee and treasurer. Upon the happening of the differences above mentioned, the committee and treasurer resigned, and the defendant Walsh proceeded to collect money, and build a church according to his own views.    Only ten dollars was paid into the hands of the treasurer, and that sum was paid by Walsh, and soon afterwards paid back by the treasurer to Walsh. The church erected upon the site of the old church was a large brick church, costing about $40,000, about $16,000 of which remains unpaid at the present time.    Large contributions were made to build this church, both by the Catholics of Portsmouth, and by others not connected with the Roman Catholic church.    The defendant Walsh gave $1,000.    The church erected has been and is now used for public worship, according to the forms of the Roman Catholic church, the defendant Walsh officiating as priest.    On Sundays the usual services of that church have been holden by the defendant Walsh at eight o'clock in the forenoon and at three o'clock in the afternoon, at which all persons are admitted who choose to attend.    At the ten o'clock Sunday morning service an admission fee of twenty-five cents has been demanded by the sexton, acting under the direction of Mr. Walsh, of all persons, except the poor, pew-holders, and those who have contributed towards the erection of the church.    Pews are also rented to individuals by the priest in the ordinary manner, and he takes the rents for the support of the services of the church.    There was considerable controversy about the propriety of the twenty-five cent admission fee; and some persons, who attempted to enter the church without paying the fee have been excluded by the sextons, acting under the direction of the priest, who claimed the fee in order to help pay the debt of the church.    There was evidence tending to show that it was against the rules established by the council of Baltimore that any one should be stopped at the door of the church to pay a fee.    There was also evidence tending to show that the rules of the council did not forbid the collection of money at the door of the church to pay the debts of the church.    The rules of the council at Baltimore may be referred to in the argument of this case, and are made part of the case.

The Roman Catholics in Portsmouth and vicinity, whose usual place of worship is this church, number about 1,500 or 2,000.    In regard to the admission fee of twenty-five cents, it was proved that a similar fee has been demanded at some other Catholic churches in New England. One of the plaintiffs, John Conlon, moved to withdraw from the suit, and another, John E. Hennessey, is a minor.    The plaintiffs are all members of the Catholic church in Portsmouth, except, perhaps, Mi-

chael Cunningham, who has been excommunicated for assault upon the priest.

*Goodall*, for the plaintiffs.

The case finds: "The sums were contributed to provide a regular Catholic service in Portsmouth, and upon promises by the several priests that such a service should be secured to the people;" also, "McCallion undertook to build a church for the use of the Catholics of Portsmouth and its vicinity;" also, "McCallion then took subscriptions and contributions from his congregation and others, and erected a wooden church upon the land;" also, "the money" paid for mortgage and sale of levy "was furnished by the people, not by the bishop;" also, "most of the plaintiffs, if not all, contributed to these objects;" that "insurance was collected to the amount of about $8,400 by Bishop Bacon;" also, answer of Bacon acknowledges insurance collected to $7,000, and that that amount has been applied in the erecting of the new church; also, answer of Walsh admits "He has used in the work the $7,000 obtained from the insurance of the former church."

Taking the facts thus found and admitted, let us apply the law thereto. Gen. Stats., ch. 139, sec. 5, reads thus: "If any donation, gift, or grant be made to any unincorporated religious society, such society shall have the like power to manage, use, and employ the same, according to the terms and conditions on which the same may be made, as incorporated societies may have by law; to elect suitable trustees, agents, or officers therefor, and to prosecute and sue for any right which may vest in them in consequence of such donation, gift, or grant, and such society shall be a corporation so far as may be necessary for the purposes expressed in this section;" also, "Section 9. No conveyance of the lands of any church shall be effectual to pass the same, if made by the trustees or deacons, without the consent of the church;" also, "Section 11. The several churches, other than those of the Episcopal denomination, are authorized to choose committees for the purpose of settling the accounts of the trustees, deacons, and other church officers," to commence suits, &c.; also, Section 14. No rights are lost or extinguished, or in any way affected, by neglect or omission of such society or corporation, &c. The statutes are the sole rule for the governing of this case. No church rule, canon, regulation, or ordinance is of any effect, when it conflicts with the statute.

*Sohier* v. *Trinity Church*, 109 Mass. 23, is decisive on this point. I quote: "Title in property must be determined by the laws of the commonwealth. The canons are matters of discipline, and cannot be enforced by legal process;" and such must be the law everywhere.

Now, by the case and admissions, we find,—gifts and donations to an incorporated religious society for the buying of the land, and the building of the church, and that it was to be secured to the people. Then the statutes and the purposes of the gifts coincide, and *the society* have the exclusive power, in the words of the statute, "to manage, use, and

employ the same, according to the terms and conditions on which the same may have been made.

The case finds the terms and conditions were as aforesaid, " to provide a regular Catholic service in Portsmouth, and upon promises by the several priests that such a service should be secured for them; " and McCallion " undertook to build a church for the use of the Catholics of Portsmouth," &c.   " Most of the plaintiffs, if not all, *contributed to these objects.*"   That being so, the said society were, by force of the statute, " a corporation; " they could " elect agents or officers; " could " prosecute," &c.   *Silsby* v. *Barlow,* 16 Gray 329.   Held, " that the persons usually attending worship in the meeting-house constituted an unincorporated religious society."   The officers could not deed away without the consent of the church, by the force of the statute; then, no deed or authority could be conveyed by statute or common law, except by vote of the society.   *Hamblett* v. *Bennett,* 6 Allen 140. " The court have no power to act against the protest or will of a minority of such society legally objecting."   *In re Proprietors New South Meeting-House,* 13 Allen 497.   There was, then, no authority or right to convey to the bishop, as the society have never voted it or authorized it in any way; and the allegations in the bill, of the assumption of the trusteeship by the defendants, and the statement in the prayer, that " the said Walsh and bishop having assumed the place of trustees illegally and wrongfully," are shown to be true by force of the statute, and the common law also.   The deed of transfer to the bishop is wholly void, and of no effect, as it is not founded on any vote of the society, and he paid no money; and the payment being by the money of the society, the mortgage was in law discharged and satisfied by the payment, and, under the general prayer for relief, it and the deed to McCallion should be set aside as a cloud upon the title of the said society. If the statutes govern, the deeds are to be held the same as though running directly to the society, and the society alone are to appoint committees, and to say how their funds are to be paid out, and neither the priest, bishop, nor pope has any more to say about it than a minister of the orthodox, Methodist, or of any other sect has to say about the property of the society or people he may be settled over from time to time.   The Catholics can have the protection of our laws, but are not to be permitted to break them more than any other sect.   Then a committee was chosen by the society at a meeting called for that purpose. The committee undertook to act; but an individual, then acting as priest or minister, says he has full control of the funds and of the church, its plans, &c., and refuses to listen to or act with the society's committees.   He was in no way, by vote or otherwise, authorized to act by the said society.   He proceeds, without authority and contrary to the desires of the committee, to get plans and build a church, and they resign in disgust.   The defendant Walsh, without law or authority, proceeded to build a church according to his views and plans, regardless of the rights of the society, using their funds and money and insurance money.   He builds it, not upon his own land, but upon land

of said society. Then, to enforce payment of expenses he has thus illegally incurred (so far as said society was concerned), he attempts to shut out members of said society from their own land and property;— for there is no principle of law better settled than this: If I build a house on land of another without right, that house becomes a part of the realty, and I cannot recover pay for building it (except under better- ment-law, which does not apply here); I cannot keep the owner of the land from entering upon the same at his pleasure. Now, if such is the law, where does a Catholic priest, bishop, or pope get a right, against the wishes of the society, to build a church on their land, using their funds against their wish, and refusing to render any account therefor, and then to compel them to pay such sums of money in such way or manner as he may choose,—and if any member of said society will not pay, to eject him without legal right or process? It is a simple prin- ciple of law, and is applicable alike to Protestant and Catholic. It is applied to Protestants; shall it not be to Catholics? The plaintiffs ask the right to have their land and church used according to the gifts and grants; and, as each of the plaintiffs has been individually wronged, he should be righted, and the fact that one of the plaintiffs is a minor does not debar him from having his rights enforced. Sup- pose the priest should make a rule excluding all minors: could they not be protected? The minor, therefore, is properly joined. The priest should be restrained, either by injunction, or else by a transfer of the title in the property from the bishop to the society, where it belongs. The sole rem- edy is in the equity side of the court. If the bishop is trustee, it is a perversion of the trust-fund and property: if he is not legally so, then the cloud on the title of the society should be removed. We say the defendants are not legal trustees, and in fact there is no occasion for any in the Catholic societies more than in the Protestant, as the society should hold the title and protect their own rights as in all other socie- ties; but if trustees are necessary, then the plaintiffs desire proper persons to be appointed, who will account to and act with the church and society.

The plaintiffs are entitled to relief, as we say, then,—1st, By force of the original terms of the gifts and donations; 2d, by force of the stat- utes. If the relief prayed for is not the proper relief, then the court can grant the proper relief under the general prayer. For instance, if the relief needed be a removal of the cloud on the title of the society in the land, by causing a conveyance from the bishop to the society, that could be granted under the general prayer;—and it seems to the plaintiffs this is the true method. Here Catholic churches hold their estate as all others do. There is no pretence in any finding of the court that a dollar was ever given, except under the statute, for the Catholics of Portsmouth, and all the defendants' statements of gifts to the Catholic church generally fall to the ground, and are en- tirely unsupported both on the evidence and law.

*Hatch* (with whom was *Frink*), for the defendants.

I. It is difficult to learn from the bill what wrong the plaintiffs complain of, or what redress they seek; more difficult to find, in the case stated by Judge RAND, any cause for complaint on the part of the plaintiffs, and impossible, from the brief of the plaintiffs' counsel, to conjecture what legal right has been violated, or what equitable relief is due.

The plaintiffs are seventeen persons, one of whom withdraws from the suit, one is a minor, and one excommunicate,—fourteen men, then, out of a congregation of from 1,500 to 2,000 Roman Catholics in Portsmouth. Without any corporate or *quasi* corporate organization, without professing to sue in the name of the whole, and without pretence of any grievance especially affecting them, they claim by this suit to control the whole church property used by the congregation, and to dispose of it in a manner which certainly is not asked for by the rest of the parties interested.

The case finds that the church property described in the bill is holden by a title, absolute upon its face, by the Rt. Rev. Bishop Bacon (now deceased). This court cannot hold it to be affected by any trust, unless it may be a trust resulting by operation of law from the payment of the purchase-money by the plaintiffs. See Gen. Stats., ch. 121, sec. 13; *Moore* v. *Moore*, 38 N. H., 382. A resulting trust can spring only from the payment of the purchase-money, or perhaps of some definite part thereof, under such circumstances that the deed ought rightfully to have been taken in the name of the party by whom the money was advanced, and it cannot be raised by advances subsequent to the deed. *Francestown* v. *Deering*, 41 N. H. 438, 443. But the plaintiffs' case will endure no such test. The property was purchased by subscriptions and contributions from the congregation and others, and has been maintained, repaired, and enlarged " by money obtained in the church for the support of the church and its services, pew rent, special subscriptions, and the private funds" of the priests in charge, of which the defendant, Mr. Walsh, gave $1,000 at one time. "Most, *if not all*, of the plaintiffs contributed to these objects;" but to which of them, how much, and upon what expectation or trust? The utmost they can claim is, that they have put indefinite sums into a common fund, and that they are entitled to share the benefits expected by the donors. But nobody stipulated, neither was it understood or expected, that the church property would be invested in the hands of a committee of the congregation, or that it would be subject to the control of the congregation. "By the usage and polity of the Roman Catholic church in New England, all church structures are held in the name of the bishop." All money given for the purchase of the land or the erection of the church, must have been given with the understanding that the title would be so vested; and the title vested according to the intention of the donors in the bishop, to be by him applied to the charitable and religious use indicated by all the circumstances attending the donations, and the erection and occupation of the church. No trust affecting the title to the property therefore resulted to the plaintiffs by reason of their donations. Yet,

contrary to the terms of their own gift, and in violation of the wishes and rights of all the other donors, the plaintiffs seek to divest the title of the bishop, and to place the property in other hands.

The case finds that the bishops of the Roman Catholic church hold the church structures " for the use of the congregations " who worship therein. No abuse of this trust is alleged by the plaintiffs, nor any attempt or threat to divert the property to any other use, nor any danger of such diversion. The suggestion that the plaintiffs, the congregation, or the court can nominate trustees of higher character, better acquainted with the wants, customs, and usages of the church, or more deeply interested in the faithful application of the church property to the pious uses for which it is intended, is clearly without foundation.

The complaints made in the bill against the character and conduct of the Rev. Mr. Walsh, as priest of the parish at Portsmouth, proved to be unfounded at the hearing; and the case stated by the judge effectually negatives the whole of them, except that he demands an admission fee of twenty-five cents, " to help pay the debt of the church," from all but " the poor, pew-holders, and those who have contributed towards the erection of the church." As " most of the plaintiffs, if not all," were contributors, it is difficult to see what cause of complaint they have. If contributors, they are admitted free ; if not contributors, they have no title to sue. And inasmuch as the conduct of the priest is under the supervision of the bishop, at whose will his appointment is held, and by whom his conformity to the law and usages of the church is required and secured, there can be no foundation for the complaint that this mode of raising money is contrary to the rules of the church or its councils. As a reasonable and equitable demand, the practice vindicates itself. The contributions named in the plaintiffs' bill were given to build a church ; and other contributions, referred to in the case stated, were given to repair and to rebuild it, and " for the support of the church and its services." But it is not to be understood, from anything but the unsupported allegations of the bill, that the services in the church were to be free to all who choose to attend. How services could be maintained or expenses paid on such a basis is not even suggested. On the contrary, it appears that the pews were rented; and we cannot see in what respect an admission fee is more objectionable than a pew rent. The claim, that men able to pay shall have the right to use the church, and have the benefit of attending all the services therein, without any payment, does not seem well addressed to a court of equity. It would be a fraud upon the pew-holders, and upon all who honestly contribute to the support of the church.

II. The fifth section of ch. 139 of the Gen. Stats. has no application to this case. The object of that statute is to enable unincorporated religious societies to receive and hold donations. It would require a forced and absurd construction of the statute to determine that all donations intended for the benefit of such societies shall be holden by them alone, or that they have the power to dispossess any trustee or person to whom property has been given for their benefit. The excep-

tion of Episcopal churches, in the eleventh section, proves that the legislation in this chapter was intended only to supply defects in church organization, and not to establish a uniform rule of holding property given to pious uses, to which all churches and parties, other than the Episcopal church, shall be compelled to conform. And it is not alleged in the bill, or found by the court, that this church, or land, or the money with which they were purchased, was given to the unincorporated society. On the contrary, the "terms and conditions" of the gifts, if any there were, must be understood to be, that the property, or, rather, the money given, should be applied according to the usage of the Roman Catholic church,—that is, that it should be holden by the bishop, and that he should "manage, use, and employ the same." Imagination must be tortured to find in this mode of holding church property anything in conflict with the statute or the laws of the state.

If the statute cited by the plaintiffs were applicable to the property named in the bill, it would follow that the property should be held or managed by "suitable trustees, agents, or officers," to be elected by "the society" (whatever they may be). Such a conclusion would dismiss the bill, because the plaintiffs do not pretend to be trustees, agents, or officers of any society, nor that any attempt has been made to choose such trustees, agents, or officers, as the statute contemplates. The plaintiffs are mere volunteers, having no equitable right to interfere. Any others of the 1,500 or 2,000 worshippers in this church might as well present their views to the court and ask for its decree; and any trustees the court might appoint would be subject to be ousted by a meeting of the "unincorporated society." The committee named in the bill was chosen "to assist" the priest in getting subscriptions, and not under the statute. They all resigned, and the plaintiffs show no authority to represent or act for them.

It is to be remembered that the title to the land has continued in the bishop and in Owen Martin, under whom he claims, as an absolute fee since Nov. 22, 1853, and as a mortgage title under McCallion since June 15, 1852, and that in all that time the title has never been questioned, or any limitation or trust attending it admitted to exist, except as stated in the answers of the defendants. If it were not lawful for the bishop to hold the property for the pious use for which it was intended and to which it has been appropriated, he would hold it in fee to his own use; but no statute prohibits any man to hold or to devote property to such uses.

III. The general want of equity in the plaintiffs' bill is evident from their embarrassment when they attempt to specify what relief they desire. They are discontented with the priest, and with the overwhelming majority of the congregation that sustain him; yet they do not ask for his removal. They complain of his exaction of a small contribution towards the debt of the church from those who wish to attend one of the services on Sunday; yet they do not ask the abrogation of the rule, or an injunction against its enforcement. They do not deny that the church property has been applied for more than twenty years exactly

to the pious use for which it was intended, and they do not pretend that any abuse of the trust is meditated; yet they ask to have the property transferred to other trustees, but they do not show what benefit they are to derive from the change. The idea of removing "a cloud upon the title" of the plaintiffs is absurd, and indicates the existence of a cloud upon the imagination of counsel. The plaintiffs have no title, and do not set up any.

If the property is holden in trust, or it is merely a holding to a pious use, the transfer of the property to some other hand could not improve the title. The court has no power to enlarge or alter any trust which may affect the property. They can go no further than to declare the existence of the pious use to which the property is dedicated; and in regard to this there is no dispute. The claim of the plaintiffs to have the property declared a free church, "where all persons may attend the services freely, and without money or price," was not supported by any evidence, and is negatived by the report of the judge who tried the cause.

CUSHING, C. J. It appears, from the facts reported in the case, that the society or congregation usually worshipping in the Catholic church in Portsmouth numbers from 1,500 to 2,000, of whom the seventeen plaintiffs appear to be the only persons dissatisfied with the management of the property. They do not complain of the dedication of this church property to the pious uses of the Catholic religion, but appear to claim that the society ought not to be excluded from the management and control of the property.

It is somewhat difficult to ascertain from the bill and the case on exactly what ground the plaintiffs desire to stand. Conceding, as they do, that this property has been given by themselves and by others to somebody for some purposes, they of course have no private rights of property. They do not profess to sue as well for the other members of the society as for themselves, so that they do not appear to represent, or claim to represent, the society collectively.

If I understand the views of the plaintiffs' counsel, they are these: They say that this property was given to McCallion, in the first instance, under such circumstances that a trust resulted to the society or congregation of Catholics in and around Portsmouth, and that, by our law,—Gen. Stats., ch. 139, sec. 5,—this fund or property having been given to that society, the society is, by virtue of the statute, endowed with corporate powers, for the purpose of protecting and managing the fund and property. I say resulting trust, because it is found by the court that the legal title to this property is vested in the bishop, but that no trust was declared in any of the conveyances of the property. No question appears to have been made in regard to the legal effect of the conveyance to McCallion, the mortgage by him, the levy on the equity of redemption for McCallion's debt by Owen Martin, the purchase of that equity by Bishop Fitzpatrick, and the purchase of the mortgage by the defendant Bacon. It is found, among the facts by

the court, that the legal title was in the bishop, now deceased, and that in the conveyances by which he obtained the title there was no declaration of trust. This is a statement of the general rule of the Catholic church, and also intended to apply to this particular case. In fact, it appears that no other result could be produced by the conveyances found in the case. I understand, therefore, the position of the plaintiffs to be, that, the legal title being first in McCallion and then in the bishop, the real ownership of the property was in the society.

Section 5, chapter 139, General Statutes, is as follows: "If any donation, gift, or grant be made to any unincorporated religious society, such society shall have the like power to manage, use, and employ the same according to the terms and conditions on which the same may be made, as incorporated societies may have by law; to elect suitable trustees, agents, or officers therefor, and to prosecute and sue for any right which may vest in them in consequence of such donation, gift, or grant; and such society shall be a corporation, so far as may be necessary for the purposes expressed in this section; but the income of the donations, gifts, or grants, to any such unincorporated religious society, shall not exceed the sum of $5,000 a year."

Under this statute, it is claimed that the society or congregation of Catholics is, for the purpose of managing this fund, a corporation, and entitled, by its duly authorized agents and committees, to sue and maintain actions, and liable to be sued. But the plaintiffs have not made this society a party, neither do they show any authority possessed by them to act for it.

It is true, that there are cases in which some of the members of the corporation may, on their own behalf and that of the other members, maintain a bill in their private capacity, where the corporation and its officers are negligently or fraudulently permitting its interests to be sacrificed.

*Pearson* v. *Tower*, *ante* 215, and *Winsor* v. *Bailey*, *ante* 218, were both cases in which a part of the stockholders suing the corporation and directors were obliged to amend, to the effect that they were suing as well for all the other stockholders as for themselves, and in each of those cases the corporation itself was made a party—*March* v. *Eastern R. R. Co.*, 40 N. H. 548; and I think it would be so in this case. These plaintiffs, not being authorized by the corporation to assert and protect its rights, must make the *quasi* corporation a party, and must show in their bill some neglect or fraudulent collusion on the part of the *quasi* corporation, in order to entitle them to interfere and draw the affairs and property of the *quasi* corporation into litigation.* The bill is therefore on this theory bad, and cannot be maintained, for both these reasons.

The answers state that "By the law, usage, and polity of the Roman Catholic church, the title to all lands used for religious purposes, churches, and so forth, is vested in the bishop of the diocese in which

---

* But see *Marston* v. *Durgin*, 54 N. H. 374.     REPORTER.

the same are situated, for the use and benefit of the universal Catholic church; and all gifts and contributions for such purposes are understood to be made under that rule."

The case finds that "By the usages of the Roman Catholic church in New England, all church structures are held in the name of the bishop for the use of the congregations who respectively attend public worship therein. The legal title is vested in the bishop. No trust was expressed in any of the conveyances above referred to, but the money was furnished by the people, not by the bishop. The bishop appoints the priests to the several parishes in his diocese, and removes them at his pleasure. Any misconduct of the priest is corrected by complaint to the bishop, who is himself answerable to his ecclesiastical superiors."

It is true that the court has found that although the legal title to this church and church property was in the bishop, yet the money was furnished by the people. There is an ambiguity in the word "people," which might mean the whole society or congregation collectively, or it might mean the gifts of individuals, members of the society. The bill and answer and report, taken together, show that the funds were the gifts and subscriptions and contributions of individuals, and not always of Roman Catholics. If any trust then resulted, it would be to the individuals who contributed the fund, and not to the society. Lord HARDWICKE, as cited by Kent, 4 Com. 306, said that a resulting trust, arising by operation of law, existed (1) when the estate was purchased in the name of one person, and the consideration came from another; (2) when a trust was declared only as to part, and nothing was said as to the residue: that residue remaining undisposed of, remained to the heir at law. He observed that he did not know of any other instances of a resulting trust, unless in cases of fraud.

Now it is not claimed in this case that there has been any fraud. The property was conveyed to McCallion just exactly as those who gave the money intended it to be. There is no claim or pretence that the funds which have been contributed have not been fairly and honestly laid out, in repairing, enlarging, and insuring the original church, and in rebuilding the new one; and it is not denied that a regular Catholic service has been secured to the society.

In the absence, then, of all pretence of fraud, the only trusts which could result would be those described above by Lord HARDWICKE. There being no declaration of trust for any part of the estate, it could not be the last of those mentioned, and it must therefore be the first, so that the effect would be that this property would be owned by the individuals who had contributed to the fund without any special trust at all, which is the exact contrary to the trust claimed in the bill.

The court, however, finds that the legal title to the property is vested in the bishop, and that by none of the conveyances have any trusts in writing been declared. It is very well settled,—*Hall* v. *Congdon, ante* 104,—that under such circumstances no parol evidence could be given to prove any special trust, so that, independently of the statements in

the answers, the property is vested in the bishop, free from all trusts whatever. It may have been prudent and wise, or it may not have been prudent and wise, in those who gave this money, to entrust it so absolutely to the bishop, without exacting from him a written declaration of the trusts on which he was to hold it. They certainly had a right to do so, and they certainly have done so.

The answers, however, show that this property is vested in the bishop for the use of the universal Catholic church; that the defendant Walsh, and the other priests who, under the bishop's direction, have controlled and managed this property, are responsible to the bishop only, and the bishop is responsible to his ecclesiastical superiors. No special trust having been declared in writing, and none being capable of being proved by parol, it is a matter between the bishop and his own conscience whether he will appropriate this property, thus vested absolutely in him for the benefit of the Catholic church, according to its rules and regulations, or otherwise. So long as he does not use the property so as to injure others or violate the laws, it is not easy to see how he is amenable to the laws.

It is clear that this court cannot, in this suit, take this property from the hands of the bishop, and place it in the hands of a new trustee.

And so far as the bill claims an accounting from the defendants Walsh and Bacon, it clearly must fail. The money which has been expended on this church property has been given absolutely to the bishop, to be used by him and under his direction, without accounting to anybody but his ecclesiastical superiors.

So, in regard to the complaint that the defendant Walsh has wrongfully excluded the plaintiffs from some of the religious services in the church, the court has not found that it is contrary to the usages and rule of the Catholic church to exact from those who are able to pay contributions, according to their means, for the support of the institutions of religion according to the Catholic faith. The case, therefore, does not call for an expression of the views of the court on this point; but I am very strongly of the opinion that this is entirely a matter of ecclesiastical jurisdiction, with which this court has nothing to do.

The bill also contains formidable charges of indecent and abusive speech on the part of the defendant Walsh, in regard to some or all of these plaintiffs.

It is enough, perhaps, to say here, that the court has not found the fact to be so. I do not understand that the bill charges any expressions of a slanderous or defamatory character. The language stated in the bill consists rather of imprecations and communications, doubtless calculated, if it had been used, to wound deeply the sensibilities of the persons against whom it is alleged to have been directed. It does not appear to me that such matters are within the civil jurisdiction of the courts. They are, rather, matters of ecclesiastical cognizance. It is quite likely that in many religious denominations, Protestant as well as others, there may be exercised a good deal of spiritual tyranny; and there may be, and probably are, many persons who, from the effect, perhaps, of

early education and associations, and the natural constitution of their mental character, are unable to resist such influences. Civil courts can protect their rights of person and property, but cannot liberate their souls. The court, however, has entirely negatived all conduct of this kind complained of in the bill.

It will be observed, that the whole question in this case is as to the conflicting claims and rights of these plaintiffs on the one hand, and of the society or congregation of Catholics in Portsmouth and their ecclesiastical directors and guides on the other. Both parties claim under the same title; and that is the legal title once vested in the defendant Bacon, and now, we must suppose, in his successor. It is true, the counsel for the plaintiffs claims that the mortgage from McCallion to his vendor was void, as not having been sanctioned by the society; but most assuredly, putting it in the strongest way for the plaintiffs, the society could not be made a *quasi* corporation until the gift which was to make them so had been completed, and the transaction, of the deed to McCallion and the mortgage back, must be considered as one.

As between these plaintiffs, then, on the one hand, and the defendants on the other, who I think must be considered as really representing the society, it appears to me that the right is with the defendants, and that the bill must be dismissed.

LADD, J., concurred.

SMITH, J. I am also of the opinion that this bill must be dismissed. The plaintiffs, seventeen in number, out of a society or congregation of some fifteen hundred, bring this suit, not in behalf of themselves and all others interested, for removing some grievance common to them all, but to effect some change in the manner in which this church property is held, not asked for or desired by the great body of their associates. The title to this lot of land, and to the church structure thereon, is, upon its face, absolute in the defendant Bacon. If it is affected by any trust, it must result, by operation of law, from the payment of the purchase-money. The property was purchased from contributions and subscriptions of sundry individuals,—Catholics and others of Portsmouth and vicinity. By the usage and polity of the Roman Catholic church, all church structures are held in the name of the bishop. All who contributed to the purchase of this lot and erection of the church edifice, did so, as the case finds, with the understanding that the title would be vested in the bishop, to be applied by him for .the purposes of religious worship, according to the Catholic faith. Having donated their money for this purpose, they cannot now impose new conditions as to the purposes for, or manner in which, it shall be held. No trust can therefore result to the plaintiffs.

The church structure erected with these funds, and so held by the defendant Bacon, has been held for the use of those who desired to worship therein as Catholics, and there is no allegation or proof that he has attempted or threatened to divert the property to any other use.

The facts reported by the judge who tried the cause fail to sustain the plaintiffs' allegation of misconduct on the part of the defendant Walsh. He has charged an admission fee for attendance upon one of the three services held on the Sabbath; but the poor, the pew-holders, and those who contributed towards the erection of the church, are exempted from this charge. Such of the plaintiffs as contributed would, of course, not be subjected to such payment, and those of the plaintiffs who did not, clearly have no such interest in the title to these premises as will entitle them to maintain this suit.

It does not appear to be contrary to the rules and usages of this denomination to require those who attend public worship to contribute to the expense thereof. However desirable it may be to furnish the opportunity for public religious worship " without money and without price," it has seldom been found practicable to do so. There is nothing in the provisions of ch. 139, Gen. Stats., that prevents any other trustee or person than those named in section 5, to whom property has been donated in trust, from holding it for the benefit of a religious corporation or society. No uniform rule is attempted to be laid down, to which every religious society, whether incorporated or not, must conform; but, rather, provision is made, whereby defects in a church organization are supplied, so that property donated for pious purposes may not fail of reaching the objects intended by the donors.

*Bill dismissed.*